# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CODON DEVICES, INC.<br><br>                                      Plaintiff,<br><br>v.<br><br>FEBIT BIOTECH GMBH, FEBIT<br>FERRARIUS BIOTECHNOLOGY AND<br>FEBIT, GMBH<br><br>                                      Defendants. | Civil Action No.: 07-CV-1177-RBW |

## DEFENDANT'S MOTION TO DISMISS OR, ALTERNATIVELY, TO TRANSFER VENUE OR, ALTERNATIVELY, TO STAY

Defendant febit holding GmbH ("febit")[1], by and through its undersigned attorneys, pursuant to FED. R. CIV. P. 12(b)(1), moves this Court to dismiss all counts of Plaintiff Codon Devices, Inc.'s ("Codon") Complaint for lack of subject matter jurisdiction. More specifically, Plaintiff Codon's Complaint should be dismissed under the first-to-file rule because Defendant febit filed suit in the United States District Court of the District of Delaware before Plaintiff Codon filed the present action. In the alternative, Defendant febit moves for a transfer of this to the United States District Court for the District of Delaware. As an additional further alternative, Defendant febit moves for a stay of this action until the completion of the Delaware action.

---

[1] At the time Codon filed the present action, febit's official name was febit biotech GmbH. Subsequently, febit changed the name to febit holding GmbH.

The Court is respectfully referred to febit's Memorandum in support of this motion and the attached exhibits.

WHEREFORE, Defendant febit prays for an Order dismissing all counts of Plaintiff Codon's Complaint for lack of subject matter jurisdiction and for such other and further relief as the Court believes necessary and just.

FEBIT HOLDING GMBH

Date:  December 10, 2007

By:    _____/s/_____
       Mark Fox Evens
       Edward J. Kessler
       W. Blake Coblentz
       STERNE, KESSLER, GOLDSTEIN & FOX PLLC
       1100 New York Avenue, NW
       Washington, D.C.  20005-3934
       (202) 371-2600

       *Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CODON DEVICES, INC.

                              Plaintiff,

v.

FEBIT BIOTECH GMBH, FEBIT
FERRARIUS BIOTECHNOLOGY AND
FEBIT, GMBH

                              Defendants.

Civil Action No.: 07-CV-1177-RBW

## MEMORANDUM IN SUPPORT OF DEFENDANT'S
## MOTION TO DISMISS OR, ALTERNATIVELY,
## TO TRANSFER VENUE OR, ALTERNATIVELY, TO STAY

Mark Fox Evens
Edward J. Kessler
W. Blake Coblentz
STERNE, KESSLER, GOLDSTEIN & FOX PLLC
1100 New York Avenue, NW
Washington, D.C. 20005-3934
(202) 371-2600

*Attorneys for Plaintiff*

## <u>TABLE OF CONTENTS</u>

FACTUAL BACKGROUND…………………………………………………………………..2

ARGUMENT…………………………………………………………………………………...3

I.   The Present Declaratory Judgment Action Should be Dismissed Under the First-To-File Rule………………………………………………………………………………………….3

   A.  febit Filed Its Patent Infringement Lawsuit Before Codon Filed the Present Declaratory Judgment Action ......................................................................................................................3

   B.  Codon's Declaratory Judgment Action Does Not Meet Any of the Exceptions to the First-to-File Rule .............................................................................................................................5

      1.  febit Did Not File Its Patent Infringement Lawsuit in Anticipation of an Impending Lawsuit from Codon ..........................................................................................................6

      2.  febit Did Not Engage in Forum Shopping ...................................................................7

      3.  The Balance of Conveniences Weigh in Favor of Dismissing this Declaratory Judgment Action ..................................................................................................................7

II.  In The Alternative, The Court Should Transfer This Action To The District Court For The District of Delaware or Stay This Action Until The Completion of the Delawaree Action....8

CONCLUSION………………………………………………………………………………….9

# TABLE OF AUTHORITIES

## Cases

*Colorado River Water Conservation District v. United States,*
  424 U.S. 800, 817 (1976) ................................................................. 3

*Electronics for Imaging, Inc. v. Jan R. Croyle,*
  394 F.3d 1341, 1347 ...................................................................... 5

*Federation Internationale,*
  285 F.Supp.2d at 66 ....................................................................... 5

*Fuller v. Abercrombie & Fitch Stores, Inc.,*
  370 F.Supp.2d 686, 688 .................................................................. 4

*Genentech, Inc. v. Eli Lilly and Co.,*
  998 F.2d 931, 937 .......................................................................... 3

*Kahn v. General Motors Corp.,*
  889 F.2d 1078, 1081 ...................................................................... 6

*Kerotest Manufacturing Co. v. C.O.Two Fire Equipment Co.,*
  342 U.S. 180 ................................................................................. 3

*Lewis v. National Football League,*
  813 F.Supp. 1, 4 ............................................................................ 6

*Pacesetter Systems, Inc. v. Medtronic, Inc.,*
  678 F.2d 93, 96 n.3 ........................................................................ 4

febit holding GmbH[1] ("febit") filed a Complaint for patent infringement of U.S. Patent No. 6,586,211 (the "'211 patent") against Codon Devices, Inc. ("Codon") in the United States District Court for the District of Delaware (the "Delaware action"). Despite the fact that Codon knew about the Delaware action, Codon filed the present declaratory judgment action for invalidity, noninfringement and unenforceabilty of the '211 patent against febit biotech GmbH, febit ferrarius biotechnology GmbH and febit, GmbH, apparently picking names that appeared in various documents, despite being on notice that febit asserted ownership of the '211 patent. febit voluntarily provided Codon with adequate documentation to establish that febit owns the '211 patent.

Nevertheless, Codon moved to dismiss febit's Delaware action, arguing that the face of the '211 patent does not identify febit as the owner of the '211 patent. In response to Codon's motion, febit provided the Delaware Court with the documents already provided to Codon that show febit owns the '211 patent. That matter has been fully briefed and is awaiting a decision from the Delaware Court. There is no legitimate reason to maintain this action since the issues in this case are covered by or can be addressed in the first-filed Delaware action.

Based on the first-to-file rule, febit moves to dismiss the present declaratory judgment action under Federal Rule of Civil Procedure 12(b)(1). In the alternative, febit moves to transfer the present declaratory judgment action to the United States District Court for the District of Delaware or moves for a stay of the present action until the conclusion of the Delaware action because the same parties are litigating the same issues.

---

[1] At the time febit filed the Delaware action, its official name was febit biotech GmbH. Subsequently, febit changed the name to febit holding GmbH.

1

## FACTUAL BACKGROUND

On June 15, 2007, febit filed a lawsuit against Codon for infringement of the '211 patent in the United States District Court for the District of Delaware and served the Complaint on July 9, 2007. *See* Ex. 1. Codon knew about the Delaware action before filing this action on June 29, 2007. Codon's Complaint, ¶12. Codon seeks a judicial determination of the true and correct owner of the '211 patent and a declaratory judgment of invalidity, noninfringement and unenforceabilty of the '211 patent, defenses it clearly could raise in the Delaware action. *See* Complaint, ¶ *passim*.

Despite the fact that febit voluntarily provided Codon with documents showing febit's ownership of the '211 patent to address Codon's stated concerns, Codon filed a Motion to Dismiss in the Delaware action for lack of subject matter jurisdiction and for lack of standing, arguing that febit insufficiently pled facts regarding the ownership of the '211 patent. *See* Ex. 2. In its Opposition, febit argued that it sufficiently pled ownership in accordance with notice pleading rules and that it had gone further than mere notice pleading and actually provided Codon with documents sufficient to show that febit owned the '211 patent. febit provided the Delaware Court with the documents it had previously provided to Codon along with a declaration from febit's German attorney, Verena Eisenlohr, attesting that the documents provided to Codon and to the Court demonstrated that febit owned the '211 patent. Exh. 3, pp. 3-4. Thus, febit showed, for purposes of the Motion to Dismiss, that it had subject matter jurisdiction and standing. *See* Ex. 3.[2] Subsequently, Codon filed its Reply to febit's Opposition,

---

[2] While febit has attached the motion papers from the Delaware action to this Motion, febit has not attached the Exhibits because of their volume. febit will provide these documents if the Court wishes the documents included.

asserting in part that it had not challenged febit's standing.  *See* Ex. 4.  Briefing on Codon's

Motion to Dismiss is complete, and febit and Codon are awaiting a decision from the court.


# ARGUMENT

This Court should dismiss Codon's Complaint for two irrefutable reasons.  First, under

the first-to-file rule, Codon's case should be dismissed.  Second, no exceptions to the first-to-file

rule apply to require a different result.  If this Court decides against dismissing this action, this

matter should be transferred to Delaware and consolidated with febit's action or stayed.

## I. THE PRESENT DECLARATORY JUDGMENT ACTION SHOULD BE DISMISSED UNDER THE FIRST-TO-FILE RULE

### A. *febit Filed Its Patent Infringement Lawsuit Before Codon Filed the Present Declaratory Judgment Action*

This declaratory judgment action should be dismissed under the first-to-file rule because

Codon filed this action after febit filed its patent infringement lawsuit against Codon in the

United States District Court for the District of Delaware.  Both actions involve the same parties -

- febit and Codon -- and the same patent -- the '211 patent.  The Supreme Court recognizes that

duplicative litigation between district courts should be avoided.  *Colorado River Water

Conservation District v. United States*, 424 U.S. 800, 817 (1976).  The Federal Circuit has

adopted the first-to-file presumption in patent cases.  *Genentech, Inc. v. Eli Lilly and Co.*, 998

F.2d 931, 937 (Fed. Cir. 1993)(overruled on other grounds)("[w]e prefer to apply in patent cases

the general rule whereby the forum of the first-filed case is favored, unless considerations of

judicial and litigant economy, and the just and effective disposition, require otherwise").  The

general first-to-file rule was first applied to patent cases in 1952.  *See Kerotest Manufacturing

Co. v. C.O.Two Fire Equipment Co.*, 342 U.S. 180 (1952).

Whether to apply the first-to-file rule can depend upon three factors: "(1) the chronology of the actions; (2) the similarity of the parties involved; and (3) the similarity of the issues at stake." *Fuller v. Abercrombie & Fitch Stores, Inc.*, 370 F.Supp.2d 686, 688 (E.D. Ten. 2005). Those three factors, as applied to the facts of this case, warrant dismissal of this action.

febit easily satisfies the first factor. Its Delaware action preceded Codon's D.C. action by 14 days. Even though febit served its Delaware Complaint after Codon filed this action, the first-to-file rule still applies. An action commences by filing a complaint, not by service of process. *See Pacesetter Systems, Inc. v. Medtronic, Inc.*, 678 F.2d 93, 96 n.3 (9th Cir. 1982). The closeness in time between the two cases does <u>not</u> adversely affect febit's rights. In *Genentech*, the Federal Circuit stated "the rule favoring the right of the first litigant to choose the forum, absent countervailing interests of justice or convenience, is supported by '[reasons] just as valid when applied to the situation where one suit precedes the other by a day as they are in a case where a year intervenes between the suits.'" *Genentech*, 998 F.2d at 938 (citing *Martin v. Graybar Elec. Co.*, 266 F.2d 202, 205 (7th Cir. 1959)(quoting *Crosley Corp. v. Westinghouse Elec. & Mfg. Co.*, 130 F.2d 474, 475 (3d Cir. 1942)).

febit also satisfies the second factor. The parties involved in this declaratory judgment action are the same parties involved in the Delaware action. As febit stated in the Complaint it filed in the Delaware action, febit biotech GmbH owned the '211 patent at the time the Complaint was filed. *See* Exh. 1, ¶8. After filing the Complaint in the Delaware action, febit changed its name from febit biotech GmbH to febit holding GmbH. *See* Exh. 3, p. 3. As detailed in febit's Opposition to Codon's Motion to Dismiss in the Delaware action, febit ferrarius biotechnology GmbH, the name that appears on the face of the '211 patent, owned the entire right and interest at the time the '211 patent issued. *See* Ex. 3. Subsequent to issuance of the

4

'211 patent, the '211 patent went through several ownership transfers, until febit biotech GmbH obtained the '211 patent. febit biotech GmbH then changed its name to febit holding GmbH.[3] *See* Ex. 3, pp. 3. Thus, the parties in the present declaratory judgment action are the same as the parties in the Delaware action.

febit satisfies the third factor; the issues in both actions are the same. Codon's declaratory judgment action involves the '211 patent, the same subject matter as the infringement action filed by febit in Delaware.

Litigating a case between the same parties involving the same subject matter in two different jurisdictions will waste judicial resources, cause needless, extra attorneys' fees and could produce conflicting results. In the Delaware action, Codon has the opportunity to request a determination of ownership of the '211 patent and to assert noninfringement, invalidity and unenforceability defenses against the '211 patent in the Delaware action, the very issues it raises in this action.

**B.     *Codon's Declaratory Judgment Action Does Not Meet Any of the Exceptions to the First-to-File Rule***

Codon's declaratory judgment action does not satisfy the commonly recognized exceptions to the first-to-file rule, e.g., anticipatory suits, forum-shopping and balance of conveniences. *See Electronics for Imaging, Inc. v. Jan R. Croyle,* 394 F.3d 1341, 1347 (Fed. Cir. 2005)(anticipatory suits); *Federation Internationale,* 285 F.Supp.2d at 66 (anticipatory suits)[4];

---

[3] Codon's Complaint references a December 6, 2006 letter that inadvertently referred to febit biotech GmbH as febit, GmbH. Complaint ¶11. That letter does not alter the fact that the same parties are present in both actions.

[4] In the *Federation Internationale* decision, Judge Hurvelle denied plaintiff's request for a TRO, the immediate issue before the court, leaving open the defendant's motion to dismiss, transfer or stay under the first-to-file rule. The court noted the presumption with respect to the first-to-file rule. The court went further and addressed the anticipatory suit exception. That reasoning cannot help Codon. Judge Hurvelle explained that the anticipatory suit exception

*Lewis v. National Football League*, 813 F.Supp. 1, 4 (D.D.C. 1992)(anticipatory suits); *Kahn v. General Motors Corp.*, 889 F.2d 1078, 1081 (Fed. Cir. 1989)(forum-shopping and balance of conveniences).

      **1.**      ***febit Did Not File Its Patent Infringement Lawsuit in Anticipation of an Impending Lawsuit from Codon***

In *Electronics for Imaging*, EFI, after being repeatedly threatened by Coyle, the owner of a patent, with patent infringement, filed its declaratory judgment suit before Coyle filed a patent infringement suit. 394 F.3d at 1343. The district court dismissed EFI's suit, relying on the anticipatory suit exception to the first-to-file rule. *Id.* at 1346. The Federal Circuit reversed, holding that whether a party intended to preempt another's infringement suit was one factor of many, but not the only factor, in determining the dismissal on a first filed declaratory judgment suit. *Id.* at 1347. In *Electronics for Imaging*, no other factors (*inter alia*, the convenience of witnesses, convenience of parties, possibility of consolidation with related litigation, considerations relating to the real party in interest; discussed in more detail *infra*) were present and thus the district court abused its discretion by dismissing EFI's declaratory judgment action because it anticipated Coyle's action. *Id.* at 1347. Thus, the Federal Circuit concluded "[o]ur precedent, however, favors the first-to-file rule in the absence of circumstances making it 'unjust or inefficient' to permit a first-filed action to proceed to judgment, and, as indicated, no such circumstances have been shown here." *Id.* at 1347.

febit stands before this Court in a much better position than EFI stood. Unlike EFI, febit owns the patent, while EFI, as the alleged infringer, stands closer to Codon, the potential

---

benefits the patent holder against an alleged infringer if the patent holder files the infringement suit after the infringer seeks a declaratory judgment. In the instant situation, that exception does not apply because febit owns the patent rights and filed first, while the alleged infringer, Codon, filed second.

infringer.  febit filed its lawsuit in the District Court for the District of Delaware alleging that Codon infringes febit's patent.  Codon never threatened febit with litigation, nor could it. Accordingly, the anticipatory lawsuit exception does not apply in this case.  While Codon never threatened febit, febit sent a warning letter to Codon on December 6, 2006, demanding that Codon immediately discontinue using its infringing methods.  *See* Codon's Complaint ¶11. Codon ignored febit's warning, and febit filed suit.  Thus, absent other circumstances that would make it "unjust or inefficient" to permit the first-filed action to proceed to judgment (discussed *infra*), this Court should follow precedent and invoke the first-to-file rule.  *Electronics for Imaging*, 394 F.3d at 1347.

### 2.    *febit Did Not Engage in Forum Shopping*

The District Court for the District of Delaware has personal jurisdiction over Codon because Codon is incorporated in Delaware.  Thus, febit did not engage in forum shopping when it filed its lawsuit against Codon.

### 3.    *The Balance of Conveniences Weigh in Favor of Dismissing this Declaratory Judgment Action*

The balance of conveniences (*inter alia*, the convenience of witnesses, convenience of parties, possibility of consolidation with related litigation, considerations relating to the real party in interest) weigh in favor of dismissing this declaratory judgment action.  febit is a German company that has no ties to this district or Delaware.  On information and belief, Codon is incorporated in Delaware and has a principal place of business in Massachusetts.  Thus, the convenience of the witnesses and the parties is neutral if not slightly favoring Delaware because Codon is incorporated there.  As discussed in detail above, Codon already filed a Motion to Dismiss in the Delaware action based on its alleged confusion over the real party in interest of the '211 patent.  *See* Ex. 2.  Codon and febit have briefed the Motion in the Delaware action,

further weighing toward a dismissal of this action in favor of the Delaware action. *See* Exs. 2-4. As stated above, it would waste judicial resources and force the parties to incur needless attorneys' fees to allow this duplicative litigation to proceed between the same parties and over the same subject matter.

## II.    IN THE ALTERNATIVE, THE COURT SHOULD TRANSFER THIS ACTION TO THE DISTRICT COURT FOR THE DISTRICT OF DELAWARE OR STAY THIS ACTION UNTIL THE COMPLETION OF THE DELAWARE ACTION

In the alternative, febit moves for a transfer of this action to the United States District Court for the District of Delaware.  As an additional further alternative, febit moves for a stay of this action until the completion of the Delaware action.  As stated *supra*, if would be a waste of judicial resources to have duplicative litigation between the same parties over the same subject matter.

## CONCLUSION

For the foregoing reasons, febit's Motion to Dismiss should be granted under the first-to-file rule, and Codon's Complaint should be dismissed with prejudice.  In the alternative, this Court should transfer the instant action to the Delaware Court where it can be consolidated with febit's case or stay the instant action.

FEBIT HOLDING GMBH

Date:  December 10, 2007                    By:    ____/s/_____
                                                   Mark Fox Evens
                                                   Edward J. Kessler
                                                   W. Blake Coblentz
                                                   STERNE, KESSLER, GOLDSTEIN & FOX PLLC
                                                   1100 New York Avenue, NW
                                                   Washington, D.C.  20005-3934
                                                   (202) 371-2600

                                                   *Attorneys for Plaintiff*

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

FEBIT BIOTECH GMBH,
IM Neuenheimer Feld 519,
69120 Heidelberg, Germany

                Plaintiff,

v.

CODON DEVICES, INC.,
One Kendall Square,
Building 300, Third Floor,
Cambridge, MA 02139

                Defendant.

Civil Action No.:

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff febit biotech GmbH (hereinafter "febit"), through its undersigned attorneys, as and for its Complaint against Defendant Codon Devices, Inc. (hereinafter "Codon Devices"), alleges as follows:

## NATURE OF THE ACTION

1.  This is an action arising under the patent laws of the United States (35 U.S.C. §§ 271 et seq.) based upon Defendant Codon Devices' infringement of U.S. Patent No. 6,586,211 B1 entitled "Method for Producing Polymers."

## THE PARTIES

2.  Plaintiff febit is a German corporation having its principal place of business at IM Neuenheimer Feld 519, 69120 Heidelberg, Germany.

3.     Upon information and belief, Defendant Codon Devices, is a Delaware corporation, having its principal place of business at One Kendall Square, Building 300, Third Floor, Cambridge, MA 02139.

## JURISDICTION AND VENUE

4.     This action for patent infringement arises under the patent laws of the United States, United States Code, Title 35.

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6.     This Court has personal jurisdiction over Defendant Codon Devices because Codon Devices is incorporated in Delaware.

7.     Venue is proper in this district under 28 U.S.C. §§ 1391 and 1400.

## THE PATENT-IN-SUIT

8.     febit is the owner of the entire right, title and interest in and to U.S. Patent No. 6,586,211 B1 (hereinafter "the '211 patent"), issued July 1, 2003, entitled "Method for Producing Polymers." The named inventors of this patent are Peer F. Stähler, Cord F. Stähler and Manfred Muller. A true and correct copy of the '211 patent is attached to this Complaint as Exhibit A.

9.     The independent claims of the '211 patent are:

Claim 1:

> Method for synthesizing polymers, wherein said method comprises synthesizing a plurality of oligomeric building blocks by parallel synthesis steps, wherein each oligomeric building block is synthesized on a different area of a common support, detaching the plurality of oligomeric building blocks from the support and bringing the oligomeric building blocks into contact with one another to synthesize the polymer, and wherein said different areas of said common support are at least partially in fluid communication during synthesis.

2

Claim 25:

> Method for synthesizing polymers that are greater than 10,000 bp in length, wherein said method comprises synthesizing a plurality of oligomeric building blocks by parallel synthesis steps, wherein each oligomeric building block is synthesized on a different area of a common support, detaching the plurality of oligomeric building blocks from the support and bringing the oligomeric building blocks into contact with one another to synthesize the polymer, and wherein said different areas of said common support are at least partially in fluid communication during synthesis.

## COUNT I

### (Infringement of the '211 Patent Pursuant to 35 U.S.C. § 271(g))

10.    The allegations of paragraphs 1-9 above are repeated and re-alleged as if set forth fully herein.

11.    Upon information and belief, Defendant Codon Devices manufactures and uses a gene synthesis platform called the BioFAB® platform.

12.    Upon information and belief, Defendant Codon Devices' BioFAB® platform, and the methods it performs, synthesizes molecular biology devices such as DNA and protein clones, variant libraries and operon and operon variant libraries.  More specifically, Codon Devices' BioFAB® platform is used to synthesize oligonucleotides, hybridize oligonucleotides into duplexes and assemble genes from the duplexes.  Codon Devices is currently scaling the platform to design and construct molecular biology devices hundreds of kilobases to megabases in length.

13.    Upon information and belief, in 2005, Defendant Codon Devices began offering for sale and selling in the United States molecular biology devices made using its BioFAB® platform.

14.    Upon information and belief, Defendant Codon Devices continues to offer for sale and sell in the United States molecular biology devices made using its BioFAB® platform.

3

15.     Upon information and belief, Defendant Codon Devices's manufacturing process to synthesize molecular biology devices using the BioFAB® platform, if practiced in the United States, infringes literally or under the doctrine of equivalents or will infringe literally or under the doctrine of equivalents one or more claims of the '211 patent pursuant to 35 U.S.C. § 271(g).

16.     Upon information and belief, Defendant Codon Devices' offer for sale, sale or use within the United States of its molecular biology devices made using its BioFAB® platform infringes literally or under the doctrine of equivalents, one or more claims of the '211 patent pursuant to 35 U.S.C. § 271(g).

17.     Upon information and belief, Defendant Codon Devices' infringement of the '211 patent has been knowing and willful.

18.     Defendant Codon Devices' infringement of the '211 patent has caused and continues to cause febit to suffer substantial money damages.

19.     Defendant Codon Devices' infringement of the '211 patent has caused and continues to cause febit to suffer irreparable harm for which there is no adequate remedy at law.

## COUNT II

### (Infringement of the '211 Patent Pursuant to 35 U.S.C. § 271(a))

20.     The allegations of paragraphs 1-19 above are repeated and re-alleged as if set forth fully herein.

21.     Upon information and belief, Defendant Codon Devices' offer for sale, sale or use within the United States of its molecular biology devices made using its BioFAB® platform infringes literally or under the doctrine of equivalents, one or more claims of the '211 patent pursuant to 35 U.S.C. § 271(a).

4

22.    On information and belief, Defendant Codon Devices' infringement of the '211 patent has been knowing and willful.

23.    Defendant Codon Devices' infringement of the '211 patent has caused and continues to cause febit to suffer substantial money damages.

24.    Defendant Codon Devices' infringement of the '211 patent has caused and continues to cause febit to suffer irreparable harm for which there is no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, febit prays for a judgment:

A.    Entering judgment that Defendant Codon Devices has infringed the '211 patent;

B.    Entering a preliminary and permanent injunction enjoining Codon Devices and their affiliates, subsidiaries, officers, directors, employees, agents, representatives, licensees, successors, assigns and all those acting for them or on their behalf, or acting in concert or privity with them, from committing further infringement of the '211 patent;

C.    Awarding febit compensatory damages under 35 U.S.C. § 284;

D.    Awarding febit treble damages for Codon Devices' willful infringement;

E.    Awarding costs and reasonable attorney's fees in favor of febit; and

F.    Awarding febit any further relief that this Court may deem appropriate.

## JURY DEMAND

febit demands a jury trial as to all issues that are triable by a jury in this action.


FEBIT BIOTECH GMBH

Date:   June 15, 2007

By: *Mary Matterer*

P. Clarkson Collins, Jr. (#739)
Mary B. Matterer (#2696)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
302.888.6800
mmatterer@morrisjames.com


Mark Fox Evens
Edward J. Kessler
W. Blake Coblentz
STERNE, KESSLER, GOLDSTEIN & FOX PLLC
1100 New York Avenue, NW
Washington, D.C.  20005-3934
(202) 371-2600

*Attorneys for Plaintiff*

6

# EXHIBIT   A



US006586211B1

(12) **United States Patent**
Stähler et al.

(10) Patent No.: **US 6,586,211 B1**
(45) Date of Patent: **Jul. 1, 2003**

(54) **METHOD FOR PRODUCING POLYMERS**

(75) Inventors: **Peer F. Stähler**, Mannheim (DE); **Cord F. Stähler**, Weinheim (DE); **Manfred Müller**, Schriesheim (DE)

(73) Assignee: **FeBit Ferrarius Biotechnology GmbH** (DE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/869,332**

(22) PCT Filed: **Feb. 18, 2000**

(86) PCT No.: **PCT/EP00/01356**

§ 371 (c)(1),
(2), (4) Date: **Aug. 26, 2001**

(87) PCT Pub. No.: **WO00/49142**

PCT Pub. Date: **Aug. 24, 2000**

(30)      **Foreign Application Priority Data**

Feb. 19, 1999    (DE) ......................................... 199 07 080
Jun. 24, 1999    (DE) ......................................... 199 28 843
Aug. 27, 1999    (DE) ......................................... 199 40 752
Aug. 27, 1999    (WO) ............................... PCT/EP99/06316
Nov. 26, 1999    (DE) ......................................... 199 57 116

(51) Int. Cl.$^7$ .......................... **C12P 19/34**; C12Q 1/68; C07H 21/02; C07H 21/04; G06F 19/00

(52) U.S. Cl. ...................... **435/91.1**; 435/6; 536/23.1; 536/24.3; 702/19; 702/20

(58) Field of Search .................. 435/91.1, 6; 536/23.1, 536/24.3; 702/19, 20

(56)         **References Cited**

U.S. PATENT DOCUMENTS

5,510,270 A    *  4/1996  Fodor et al. ................. 436/518
6,020,481 A    *  2/2000  Benson et al. ............. 536/26.6
6,238,884 B1  *  5/2001  Short et al. ................. 435/69.1

FOREIGN PATENT DOCUMENTS

EP    0022242    1/1981
EP    0130166    1/1985
EP    0316018    5/1989
EP    0385410    9/1999
WO    WO 90 00626    1/1990
WO    WO 94 12632    6/1994
WO    WO 95 17413    6/1995
WO    WO 99 14318    3/1999
WO    WO 00 13017    3/2000

OTHER PUBLICATIONS

Stemmer W. P. C. et al., "Single–step assembly of a gene and entire plasmid from large numbers of oligodeoxyribonucle-otides", Gene, vol. 164, pp. 49–53 (1995).*

S. Rayner et al.: "MerMade: An oligodeoxyribonucleotide synthesizer for high throughput oligonucleotide production in dual 96–well plates" PCR Methods and Applications, US, Cold Spring Harbor, NY vol. 8, No. 7 Jul. 1, 1998 pp. 741–747.

L E Sindelar and J M Jaklevic: High–throughput DNA synthesis in a multichannel format Nucleic Acids Research, GB, Oxford University Press, Surrey, vol. 23, No. 6, Jan. 1, 1995, pp. 982–987.

Lashkari D A et al.: "An Automated Multiplex Oligonucle-otide Synthesizer: Development of High–Throughput, Low–Cost DNA Synthesis" Proceedings of the National Academy of Sciences of USA, US, National Academy of Science. Washington, vol. 92, No. 17, Aug. 15, 1995 pp. 7912–7915.

* cited by examiner

*Primary Examiner*—Kenneth R. Horlick
*Assistant Examiner*—Teresa Strzelecka
(74) *Attorney, Agent, or Firm*—Rothwell, Figg, Ernst & Manbeck, PC

(57)           **ABSTRACT**

The invention relates to a method for producing polymers, in particular synthetic nucleic acid double strands of optional sequence, comprising the steps:

(a) provision of a support having a surface area which contains a plurality of individual reaction areas,

(b) location-resolved synthesis of nucleic acid fragments having in each case different base sequences in several of the individual reaction areas, and

(c) detachment of the nucleic acid fragments from individual reaction areas.

**26 Claims, 7 Drawing Sheets**

# Fig.1



# Fig.2



# Fig.3



33

32

31

# Fig.4

33

Fig.5



Fig.6



Fig.7



Fig.8

51b

64 (NUCLEIC ACID HYBRID 85)

65

63

62

66

US 6,586,211 B1

**1**

# METHOD FOR PRODUCING POLYMERS

## DESCRIPTION

The invention relates to a method for producing polymers, in particular synthetic nucleic acid double strands of optional sequence.

1. Technical Background of the Invention

Manipulation and construction of genetic elements such as, for example, gene fragments, whole genes or regulatory regions through the development of DNA recombination technology, which is often also referred to as genetic engineering, led to a particular need for genetic engineering methods and further development thereof in the areas of gene therapy, molecular medicine (basic research, vector development, vaccines, regeneration, etc.). Important areas of application are also the development of active substances, production of active substances in the context of the development of pharmaceuticals, combinatorial biosynthesis (antibodies, effectors such as growth factors, neural transmitters, etc.), biotechnology (e.g. enzyme design, pharming, biological production methods, bioreactors, etc.), diagnostics (BioChips, receptors/antibodies, enzyme design, etc.) and environmental technology (specialized or custom microorganisms, production processes, cleaning-up, sensors, etc.).

2. Prior Art

Numerous methods, first and foremost enzyme-based methods, allow specific manipulation of DNA for different purposes.

All of said methods have to use available genetic material. Said material is, on the one hand, well-defined to a large extent but allows, on the other hand, in a kind of "construction kit system" only a limited amount of possible combinations of the particular available and slightly modified elements.

In this connection, completely synthetic DNA has so far played only a minor part in the form of one of these combinatorial elements, with the aid of which specific modifications of the available genetic material are possible.

The known methods share the large amount of work required, combined with a certain duration of appropriate operations, since the stages of molecular biological and in particular genetic experiments such as DNA isolation, manipulation, transfer into suitable target cells, propagation, renewed isolation, etc. usually have to be repeated several times. Many of the operations which come up can only insufficiently be automated and accelerated so that the corresponding work remains time-consuming and labor-intensive. For the isolation of genes, which must precede functional study and characterization of the gene product, the flow of information is in most cases from isolated RNA (mRNA) via cDNA and appropriate gene libraries via complicated screening methods to a single clone. The desired DNA which has been cloned in said clone is frequently incomplete, so that further screening processes follow.

Finally, the above-described recombination of DNA fragments has only limited flexibility and allows, together with the described amount of work required, only few opportunities for optimization. In view of the variety and complexity in genetics, functional genomics and proteomics, i.e. the study of gene product actions, such optimizations in particular are a bottleneck for the further development of modern biology.

A common method is recombination by enzymatic methods (in vitro): here, DNA elements (isolated genomic DNA,

**2**

plasmids, amplicons, viral or bacterial genomes, vectors) are first cut into fragments with defined ends by appropriate restriction enzymes. Depending on the composition of these ends, it is possible to recombine the fragments formed and to link them to form larger DNA elements (likewise enzymatically). For DNA propagation purposes, this is frequently carried out in a plasmid acting as cloning vector.

The recombinant DNA normally has to be propagated clonally in suitable organisms (cloning) and, after this time-consuming step and isolation by appropriate methods, is again available for manipulations such as, for example, recombinations. However, the restriction enzyme cleavage sites are a limiting factor in this method: each enzyme recognizes a specific sequence on the (double-stranded) DNA, which is between three and twelve nucleotide bases in length, depending on the particular enzyme, and therefore, according to statistical distribution, a particular number of cleavage sites at which the DNA strand is cut is present on each DNA element. Cutting the treated DNA into defined fragments, which can subsequently be combined to give the desired sequence, is important for recombination. Sufficiently different and specific enzymes are available for recombination technology up to a limit of 10–30 kilo base pairs (kbp) of the DNA to be cut. In addition, preliminary work and commercial suppliers provide corresponding vectors which take up the recombinant DNA and allow cloning (and thus propagation and selection). Such vectors contain suitable cleavage sites for efficient recombination and integration.

With increasing length of the manipulated DNA, however, the rules of statistics give rise to the problem of multiple and unwanted cleavage sites. The statistical average for an enzyme recognition sequence of 6 nucleotide bases is one cleavage site per 4000 base pairs ($4^6$) and for 8 nucleotide bases it is one cleavage site per 65,000 ($4^8$). Recombination using restriction enzymes therefore is not particularly suitable for manipulating relatively large DNA elements (e.g. viral genomes, chromosomes, etc.).

Recombination by homologous recombination in cells is known, too. Here, if identical sequence sections are present on the elements to be recombined, it is possible to newly assemble and manipulate relatively large DNA elements by way of the natural process of homologous recombination. These recombination events are substantially more indirect than in the case of the restriction enzyme method and, moreover, more difficult to control. They often give distinctly poorer yields than the above-described recombination using restriction enzymes.

A second substantial disadvantage is restriction to the identical sequence sections mentioned which, on the one hand, have to be present in the first place and, on the other hand, are very specific for the particular system. The specific introduction of appropriate sequences itself then causes considerable difficulties.

An additional well-known method is the polymerase chain reaction (PCR) which allows enzymatic DNA synthesis (including high multiplication) due to the bordering regions of the section to be multiplied indicating a DNA replication start by means of short, completely synthetic DNA oligomers ("primers"). For this purpose, however, these flanking regions must be known and be specific for the region lying in between. When replicating the strand, however, polymerases also incorporate wrong nucleotides, with a frequency depending on the particular enzyme, so that there is always the danger of a certain distortion of the starting sequence. For some applications, this gradual dis-

US 6,586,211 B1

**3**

tortion can be very disturbing. During chemical synthesis, sequences such as, for example, the above-described restriction cleavage sites can be incorporated into the primers. This allows (limited) manipulation of the complete sequence. The multiplied region can now be in the region of approx. 30 kbp, but most of this DNA molecule is the copy of a DNA already present.

The primers are prepared using automated solid phase synthesis and are widely available, but the configuration of all automatic synthesizers known to date leads to the production of amounts of primer DNA (μmol-range reaction mixtures) which are too large and not required for PCR, while the variety in variants remains limited.

Synthetic DNA Elements

Since the pioneering work of Khorana (inter alia in: Shabarova: Advanced organic Chemistry of Nucleic Acids, VCH Weinheim;) in the 1960s, approaches in order to assemble double-stranded DNA with genetic or coding sequences from chemically synthesized DNA molecules have repeatedly been described. State of the art here is genetic elements of up to approx. 2 kbp in length which are synthesized from nucleic acids. Chemical solid phase synthesis of nucleic acids and peptides has been automated. Appropriate methods and devices have been described, for example, in U.S. Pat. Nos. 4,353,989 and 5,112,575.

Double-stranded DNA is synthesized from short oligonucleotides according to two methods (see Holowachuk et al., PCR Methods and Applications, Cold Spring Harbor Laboratory Press): on the one hand, the complete double strand is synthesized by synthesizing single-stranded nucleic acids (with suitable sequence), attaching complementary regions by hybridization and linking the molecular backbone by, for example, ligase. On the other hand, there is also the possibility of synthesizing regions overlapping at the edges as single-stranded nucleic acids, attachment by hybridization, filling in the single-stranded regions via enzymes (polymerases) and linking the backbone.

In both methods, the total length of the genetic element is restricted to only a few thousand nucleotide bases due to, on the one hand, the expenditure and production costs of nucleic acids in macroscopic column synthesis and, on the other hand, the logistics of nucleic acids being prepared separately in macroscopic column synthesis and then combined. Thus, the same size range as in DNA recombination technology is covered.

To summarize, the prior art can be described as a procedure in which, in analogy to logical operations, the available matter (in this case genetic material in the form of nucleic acids) is studied and combined (recombination). The result of recombination experiments of this kind is then studied and allows conclusions, inter alia about the elements employed and their combined effect. The procedure may therefore be described as (selectively) analytical and combinatorial.

The prior art thus does not allow any systematic studies of any combinations whatsoever. The modification of the combined elements is almost impossible. Systematic testing of modifications is impossible.

SUBJECT OF THE INVENTION AND OBJECT ACHIEVED THEREWITH

It is intended to provide a method for directly converting digital genetic information (target sequence, databases, etc.) into biochemical genetic information (nucleic acids) without making use of nucleic acid fragments already present.

The invention therefore relates to a method for producing polymers, in which a plurality of oligomeric building blocks

**4**

is synthesized on a support by parallel synthesis steps, is detached from the support and is brought into contact with one another to synthesize the polymer. Preference is given to synthesizing double-stranded nucleic acid polymers of at least 300 bp, in particular at least 1000 bp in length. The nucleic acid polymers are preferably selected from genes, gene clusters, chromosomes, viral and bacterial genomes or sections thereof. The oligomeric building blocks used for synthesizing the polymer are preferably 5–150, particularly preferably 5–30, monomer units in length. In successive steps, it is possible to detach in each case partially complementary oligonucleotide building blocks from the support and to bring them into contact with one another or with the polymer intermediate under hybridization conditions. Further examples of suitable polymers are nucleic acid analogs and proteins.

In a particularly preferred embodiment, the invention relates to a method for producing synthetic DNA of any optional sequence and thus any known or novel functional genetic elements which are contained in said sequence. This method comprises the steps

    (a) provision of a support having a surface which contains a plurality of individual reaction areas,

    (b) location-resolved synthesis of nucleic acid fragments having in each case different base sequences in several of the individual reaction areas, and

    (c) detachment of the nucleic acid fragments from individual reaction areas.

The base sequences of the nucleic acid fragments synthesized in individual reaction areas are preferably chosen such that they can assemble to form a nucleic acid double strand hybrid. The nucleic acid fragments can then be detached in step (c) in one or more steps under conditions such that a plurality, i.e. at least some of the detached nucleic acid fragments assemble to form a nucleic acid double strand hybrid. Subsequently, the nucleic acid fragments forming one strand of the nucleic acid double strand hybrid can at least partially be linked covalently to one another. This may be carried out by enzymatic treatment, for example using ligase, or/and filling in gaps in the strands using DNA polymerase.

The method comprises within the framework of a modular system the synthesis of very many individual nucleic acid strands which serve as building blocks and, as a result, a double-stranded nucleic acid sequence which can be more than 100,000 base pairs in length is generated, for example in a microfluidic reaction support.

The highly complex synthetic nucleic acid which preferably consists of DNA is produced according to the method and according to the following principle: first, relatively short DNA strands are synthesized in a multiplicity of reaction areas on a reaction support by. in situ synthesis. This may take place, for example, using the supports described in the patent applications DE 199 24 327.1, DE 199 40 749.5, PCT/EP99/06316 and PCT/EP99/06317. In this connection, each reaction area is suitable for the individual and specific synthesis of an individual given DNA sequence of approx. 10–100 nucleotides in length. These DNA strands form the building blocks for the specific synthesis of very long DNA molecules. The fluidic microprocessor used here may carry reaction spaces specially designed for the application.

The DNA synthesis itself is thus carried out by following the automated solid phase synthesis but with some novel aspects: the "solid phase" in this case is an individual reaction area on the surface of the support, for example the wall of the reaction space, i.e. it is not particles introduced

US 6,586,211 B1

5

into the reaction space as is the case in a conventional synthesizer. Integration of the synthesis in a microfluidic reaction support (e.g. a structure with optionally branched channels and reaction spaces) makes it possible to introduce the reagents and other components such as enzymes.

After synthesis, the synthesized building blocks are detached from said reaction areas. This detachment process may be carried out location- or/and time-specifically for individual, several or all DNA strands.

In a preferred variant of the method it is provided for a plurality of reaction areas to be established and utilized within a fluidic space or compartment so that the DNA strands synthesized therein can be detached in one operation step and taken away from the compartment which fluidically connects the reaction areas.

Subsequently, suitable combinations of the detached DNA strands are formed. Single-stranded or/and double-stranded building blocks are then assembled, for example, within a reaction space which may comprise one or more reaction areas for the synthesis. Expediently, the sequence of the individual building blocks is chosen such that, when bringing the individual building blocks into contact with one another, regions complementary to one another are available at the two ends brought together, in order to make possible specific attachment of further DNA strands by hybridizing said regions. As a result, longer DNA hybrids are formed. The phosphorus diester backbone of these DNA hybrids may be covalently closed, for example by ligases, and possible gaps in the double strand may be filled in in a known manner enzymatically by means of polymerases. Single-stranded regions which may be present may be filled in by enzymes (e.g. Klenow fragment) with the addition of suitable nucleotides. Thus longer DNA molecules are formed. By bringing together clusters of DNA strands synthesized in this way within reaction spaces it is in turn possible to generate longer part sequences of the final DNA molecule. This may be done in stages, and the part sequences are put together to give ever longer DNA molecules. In this way it is possible to generate very long DNA sequences as completely synthetic molecules of more than 100,000 base pairs in length.

The amount of individual building blocks which is required for a long synthetic DNA molecule is dealt with in the reaction support by parallel synthesis of the building blocks in a location- or/and time-resolved synthesis process. In the preferred embodiment, this parallel synthesis is carried out by light-dependent location- or/and time-resolved DNA synthesis in a fluidic microprocessor which is also described in the patent applications DE 199 24 327.1, DE 199 40 749.5, PCT/EP99/06316 and PCT/EP99/06317.

The miniaturized reaction support here causes a reduction in the amount of starting substances by at least a factor of 1000 compared with a conventional DNA synthesizer. At the same time, an extremely high number of nucleic acid-double strands of defined sequence is produced. Only in this way is it possible to generate a very large variety of individual building blocks, which is required for the synthesis of long DNA molecules, by using an economically sensible amount of resources. The synthesis of a sequence of 100,000 base pairs, composed of overlapping building blocks of 20 nucleotides in length, requires 10,000 individual building blocks. This can be achieved using appropriately miniaturized equipment in a highly parallel synthesis process.

For efficient processing of genetic molecules and systematic inclusion of all possible variants it is necessary to produce the individual building block sequences in a flexible and economic way. This is achieved by the method preferably by using a programmable light source matrix for the

6

light-dependent location- or/and time-resolved in situ synthesis of the DNA strands, which in turn can be used as building blocks for the synthesis of longer DNA strands. This flexible synthesis allows free programming of the individual building block sequences and thus also generation of any variants of the part sequences or the final sequence, without the need for substantial modifications of system components (hardware). This programmed synthesis of the building blocks and thus the final synthesis products makes it possible to systematically process the variety of genetic elements. At the same time, the use of computer-controlled programmable synthesis allows automation of the entire process including communication with appropriate databases.

With a given target sequence, the sequence of the individual building blocks can be selected efficiently, taking into account biochemical and functional parameters. After putting in the target sequence (e.g. from a database), an algorithm makes out suitable overlapping regions. Depending on the task, different amounts of target sequences can be produced, either within one reaction support or spread over a plurality of reaction supports. The hybridization conditions for formation of the hybrids, such as, for example, temperature, salt concentrations, etc., are adjusted to the available overlap regions by an appropriate algorithm. Thus, maximum attachment specificity is ensured. In a fully automatic version, it is also possible to take target sequence data directly from public or private databases and convert them into appropriate target sequences. The products generated may in turn be introduced optionally into appropriately automated processes, for example into cloning in suitable target cells.

Synthesis in stages by synthesizing the individual DNA strands in reaction areas within enclosed reaction spaces also allows the synthesis of difficult sequences, for example those with internal repeats of sequence sections, which occur, for example, in retroviruses and corresponding retroviral vectors. The controlled detachment of building blocks within the fluidic reaction spaces makes a synthesis of any sequence possible, without problems being generated by assigning the overlapping regions on the individual building blocks.

The high quality requirements necessary for synthesizing very long DNA molecules can be met inter alia by using real-time quality control. This comprises monitoring the location-resolved building block synthesis, likewise detachment and assembly up to production of the final sequence. Then all processes take place, in a transparent reaction support. In addition, the possibility to follow reactions and fluidic processes in transmitted light mode, for example by CCD detection, is created.

The miniaturized reaction support is preferably designed such that a detachment process is possible in the individual reaction spaces and thus the DNA strands synthesized on the reaction areas located within these reaction spaces are detached individually or in clusters. In a suitable embodiment of the reaction support it is possible to assemble the building blocks in reaction spaces in a process in stages and also to remove building blocks, part sequences or the final product or else to sort or fractionate the molecules.

The target sequence, after its completion, may be introduced as integrated genetic element into cells by transfer and thereby be cloned and studied in functional studies. Another possibility is to firstly further purify or analyze the synthesis product, a possible example of said analysis being sequencing. The sequencing process may also be initiated by direct coupling using an appropriate apparatus, for example using

US 6,586,211 B1

7                                                    8

a device described in the patent applications DE 199 24 327.1, DE 199 40 749.5, PCT/EP99/06316 and PCT/EP99/06317 (corresponding 35 U.S.C. §371 application is U.S. patent application Ser. No. 09/763,914) for the integrated synthesis and analysis of polymers It is likewise conceivable to isolate and analyze the generated target sequences after cloning.

The method of the invention provides via the integrated genetic elements generated therewith a tool which, for the further development of molecular biology, includes biological variety in a systematic process. The generation of DNA molecules with desired genetic information is thus no longer the bottleneck of molecular biological work, since all molecules, from small plasmids via complex vectors to mini chromosomes, can be generated synthetically and are available for further work.

The production method allows generation of numerous different nucleic acids and thus a systematic approach for questions concerning regulatory elements, DNA binding sites for regulators, signal cascades, receptors, effect and interactions of growth factors, etc.

The integration of genetic elements into a fully synthetic complete nucleic acid makes it possible to further utilize known genetic tools such as plasmids and vectors and thus to build on the relevant experience. On the other hand, this experience will change rapidly as a result of the intended optimization of available vectors, etc. The mechanisms which, for example, make a plasmid suitable for propagation in a particular cell type can be studied efficiently for the first time on the basis of the method of the invention.

This efficient study of large numbers of variants makes it possible to detect the entire combination space of genetic elements. Thus, in addition to the at the moment rapidly developing highly parallel analysis (inter alia on DNA arrays or DNA chips), the programmed synthesis of integrated genetic elements is created as a second important element. Only both elements together can form the foundation of an efficient molecular biology.

The programmed synthesis of appropriate DNA molecules makes possible not only random composition of the coding sequences and functional elements but also adaptation of the intermediate regions. This may rapidly lead to minimal vectors and minimal genomes, whose small size in turn generates advantages. As a result, transfer vehicles such as, for example, viral vectors can be made more efficient, for example when using retroviral or adenoviral vectors.

In addition to the combination of known genetic sequences, it is possible to develop novel genetic elements which can build on the function of available elements. Especially for such developmental work, the flexibility of the system is of enormous value.

The synthetic DNA molecules are in each stage of the development of the method described here fully compatible with the available recombination technology. For "traditional" molecular biological applications it is also possible to provide integrated genetic elements, for example by appropriate vectors. Incorporation of appropriate cleavage sites even of enzymes little used so far is not a limiting factor for integrated genetic elements.

## IMPROVEMENTS IN COMPARISON WITH PRIOR ART

This method makes it possible to integrate all desired functional elements as "genetic modules" such as, for example, genes, parts of genes, regulatory elements, viral packaging signals, etc. into the synthesized nucleic acid molecule as carrier of genetic information. This integration leads to inter alia the following advantages:

It is possible to develop therewith extremely functionally integrated DNA molecules, unnecessary DNA regions being removed (minimal genes, minimal genomes).

The free combination of the genetic elements and also modifications of the sequence such as, for example, for adaptation to the expressing organism or cell type (codon usage) are made possible as well as modifications of the sequence for optimizing functional genetic parameters such as, for example, gene regulation.

Modifications of the sequence for optimizing functional parameters of the transcript, for example splicing, regulation at the mRNA level, regulation at the translation level, and, moreover, the optimization of functional parameters of the gene product, such as, for example, the amino acid sequence (e.g. antibodies, growth factors, receptors, channels, pores, transporters, etc.) are likewise made possible.

On the whole, the system created by the method is extremely flexible and allows in a manner previously not available the programmed production of genetic material under greatly reduced amounts of time, materials and work needed.

Using the available methods, it has been almost impossible to specifically manipulate relatively large DNA molecules of several hundred kbp, such as chromosomes for example. Even more complex (i.e. larger) viral genomes of more than 30 kbp (e.g. adenoviruses) are difficult to handle and to manipulate using the classical methods of gene technology.

The method of the invention leads to a considerable shortening up to the last stage of cloning a gene: the gene or the genes are synthesized as DNA molecule and then (after suitable preparation such as purification, etc.) introduced directly into target cells and the result is studied. The multi-stage cloning process which is mostly carried out in microorganisms such as *E. coli* (e.g. DNA isolation, purification, analysis, recombination, cloning in bacteria, isolation, analysis, etc.) is thus reduced to the last transfer of the DNA molecule into the final effector cells. For synthetically produced genes or gene fragments clonal propagation in an intermediate host (usually *E. coli*) is no longer required. This avoids the danger of the gene product destined for the target cell exerting a toxic action on the intermediate host. This is distinctly different from the toxicity of some gene products, which, when using classical plasmid vectors, frequently leads to considerable problems for cloning of the appropriate nucleic acid fragments.

Another considerable improvement is the reduction in time and the reduction in operational steps to after the sequencing of genetic material, with potential genes found being verified as such and cloned. Normally, after finding interesting patterns, which are possible open reading frames (ORF), probes are used (e.g. by means of PCR) to search in cDNA libraries for appropriate clones which, however, need not contain the whole sequence of the mRNA originally used in their production. In other methods, an expression gene library is searched by means of an antibody (screening). Both methods can be shortened very substantially using the method of the invention: if a gene sequence determined "in silico" is present (i.e. after detection of an appropriate pattern in a DNA sequence by the computer) or after decoding a protein sequence, an appropriate vector with the sequence or variants thereof can be generated directly via programmed synthesis of an integrated genetic element and introduced into suitable target cells.

The synthesis taking place in this way of DNA molecules of up to several 100 kbp allows the direct complete synthesis

US 6,586,211 B1

9

of viral genomes, for example adenoviruses. These are an important tool in basic research (inter alia gene therapy) but, due to the size of their genome (approx. 40 kbp), are difficult to handle using classical genetic engineering methods. As a result, the rapid and economic generation of variants for optimization in particular is greatly limited. This limitation is removed by the method of the invention.

The method leads to integration of the synthesis, detachment of synthesis products and assembly to a DNA molecule being carried out in one system. Using production methods of microsystem technology, it is possible to integrate all necessary functions and process steps up to the purification of the final product in a miniaturized reaction support. These may be synthesis areas, detachment areas (clusters), reaction spaces, feeding channels, valves, pumps, concentrators, fractionation areas, etc.

Plasmids and expression vectors may be prepared directly for sequenced proteins or corresponding part sequences and the products may be analyzed biochemically and functionally, for example by using suitable regulatory elements. This omits the search for clones in a gene library. Correspondingly, ORFs from sequencing work (e.g. Human Genome Project) can be programmed directly into appropriate vectors and be combined with desired genetic elements. An identification of clones, for example by complicated screening of cDNA libraries, is removed. Thus, the flow of information from sequence analysis to function analysis has been greatly reduced, because on the same day on which an ORF is present in the computer due to analysis of primary data, an appropriate vector including the putative gene can be synthesized and made available.

Compared with conventional solid-phase synthesis for obtaining synthetic DNA, the method according to the invention is distinguished by a small amount of material needed. In order to produce thousands of different building blocks for generating a complex integrated genetic element of several 100,000 kbp in length, in an appropriately parallelized format and with appropriate miniaturization (see exemplary embodiments), a microfluidic system needs markedly fewer starting substances for an individual DNA oligomer than a conventional solid-phase synthesis apparatus (when using a single column). Here, microliters compare with the consumption of milliliters, i.e. a factor of 1000.

Taking into account the newest findings in immunology, the presented method allows an extremely efficient and rapid vaccine design (DNA vaccines).

EXEMPLARY EMBODIMENTS

To carry out the method, the present invention requires the provision of a large number of nucleic acid molecules, usually DNA, whose sequence can be freely determined. These building blocks must have virtually 100% identical sequences within one building block species (analogously to the synthesis performance of conventional synthesizers). Only highly parallel synthesis methods are suitable for generating the required variance. In order for the system to be able to work flexibly and, despite the necessary multiplicity of different building blocks to be synthesized, to require as little space and as few reagents as possible, the method is preferably carried out in a microfluidic system within which the individual sequences are produced in a determinable form. Two types of programmed synthesis are suitable for systems of this kind, which are also described in the patent applications DE 199 24 327.1, DE 199 40 749.5, PCT/EP99/06316 and PCT/EP99/06317: these are first the synthesis by programmable fluidic individualization of the

10

reaction areas and, secondly, the synthesis by programmable light-dependent individualization of the reaction areas.

In both variants, synthesis is carried out in a microfluidic reaction support. The design of this reaction support may provide in the system for the bringing together in stages the detached synthesis products, i.e. building blocks, by collecting the nucleic acid strands, after detaching them, in appropriate reaction areas and the assembly taking place there. Groups of such assembly areas may then for their part be brought into contact again with one another so that during the course of a more or less long cascade the final synthesis products are produced: genetic information carriers in the form of DNA molecules. The following variants are suitable here: Either synthesis, detachment and assembly are carried out chronologically but spatially integrated in a microfluidic reaction support or synthesis, detachment and assembly are carried out partially in parallel in one or more microfluidic reaction supports. It is furthermore possible that the microfluidic reaction support contains only reaction areas for the programmed synthesis and that subsequently detachment and elution into a reaction vessel for the assembly are carried out.

In the case of very large DNA molecules, synthesis, detachment and assembly can be supplemented by condensation strategies which prevent break-up of the molecules. This includes, for example, the use of histones (nuclear proteins which make condensation of the chromosomes in the nucleus possible in eukaryotes), the use of topoisomerases (enzymes for twisting DNA in eukaryotes and prokaryotes) or the addition of other DNA-binding, stabilizing and condensing agents or proteins. Depending on the design of the reaction support, this may take place by integrating the condensation reaction in another reaction chamber provided therefor or by addition during the combination and assembly in stages of the building blocks.

The free choice of sequence is of essential importance for the controlled and efficient building block assembly in stages to the final product. For the choice of overlapping complementary ends influences the specificity of the assembly and the overall biochemical conditions (salt concentration, temperature, etc.). When providing a sequence for the gene of interest and after automatic or manual selection of the other genetic elements (regulatory regions, resistance genes for cloning, propagation signals, etc.) for determination of the final product (e.g. a plasmid vector), the provided sequence is fragmented into suitable building blocks which are then synthesized in the required number of reaction supports. The fragments or their overlap regions to be hybridized are chosen such that the conditions for hybridizing are as similar as possible (inter alia GC : AT ratio, melting points, etc.).

Further extension of the system provides for elements for purification and isolation of the product forming, which are likewise designed by microfluidics or microsystem technology. Said elements may be, for example, methods in which the final double-stranded DNA after its synthesis using fluorescent synthons must have a particular total fluorescence. When using proteins with condensing action, these proteins, where appropriate, may also carry a fluorescent label which is preferably detectable separately (reference signal). It is then possible to sort the mixture of final reaction product in the reaction support structures according to fluorescence (see Chou et al., Proceedings of the National Academy of Science PNAS 96:11–13, 1999). Thus a sufficient quality is achieved in order to directly provide a product for further work.

Information from sequencing projects, which is present in databases, may be studied for genes fully automatically

US 6,586,211 B1

11

(computer-assisted). Identified or putative genes (ORFs) are converted into completely synthetic DNA which may contain, where appropriate, regulatory and other genetic elements which seem suitable, so that, for example, one or more vectors are generated. The product is either made available (e.g. as pure DNA) or directly introduced to functional studies, inter alia by transfer into suitable target cells. The information may come from public databases, from work of decentralized users or from other sources, for example the method described in the patent applications DE 199 24 327.1 and DE 199 40 749.5.

It may be of interest that a variance of randomized sequence occurs at a particular site or sites of the target sequence. An example is the testing of variants of a binding site into which, for example over an area of 20 amino acids, i.e. 60 nucleotides, random variations of nucleotides were incorporated. This may take place in an embodiment in that during the synthesis process, after activating a reaction area, a mixture of synthons is added so that all added synthons can hybridize in a statistically distributed manner. A modification of this process may provide for DNA building blocks of different length to be used at a particular position of the target sequence, for example by producing different building blocks on different reaction areas, which show the same sequence for overlapping and hybridization.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a vertical section of a reaction support 30 which is orthogonal to the microchannels 33 present thereon, which are separated from one another by walls 32. The bottom 31 of the reaction support is transparent. Furthermore, a single-stranded nucleic acid 10 with the designation of the 5' and 3' ends according to convention is depicted diagrammatically. These are depicted as 10a with the 3' end covalently bound to the reaction support 30 by solid-phase synthesis. A light source matrix 20 with a light source and a controllable illumination exit facing the reaction support 30 is likewise depicted.

FIG. 2 shows a top view of reaction support 30 with reaction areas 12 and the walls 32 between the microchannels 33. The arrows indicate the direction of flow.

FIG. 3 shows, similar to FIG. 1, a vertical section through the reaction support 30, with the single-stranded nucleic acids in the microchannel 33 being detached.

FIG. 4 again depicts a top view of the reaction support 30, with the single-stranded nucleic acids in the microchannel 33 being detached.

FIG. 5 shows a top view of the arrangement of microchannels with fluidic reaction spaces 50, which contain the individual reaction areas, and reaction chambers, where a part sequence is assembled. In the reaction space 54 all microchannels within a reaction support are brought together. The final synthesis product is assembled there, too, and is removed through exit 55. The reference numbers 51a and 51b indicate the representations of a reaction chamber which are shown in enlarged form in FIG. 6 and FIG. 7 and FIG. 8. The arrows again signal the direction of flow.

FIG. 6 shows an enlarged representation of a reaction chamber 51a after a microchannel with detached single-stranded nucleic acids.

FIG. 7 shows an enlarged representation of a reaction chamber 51a after a microchannel with a double-stranded hybrid 60 composed of two attached complementary nucleic acid single strands.

FIG. 8 shows an enlarged representation of a reaction chamber 51b after bringing together two microchannels with

12

an assembled double-stranded nucleic acid hybrid 62, enzyme 63 (e.g. ligases) for the covalent linkage of the building blocks of the nucleic acid hybrid 85, a linear covalently linked nucleic acid double strand 65 and a circular closed nucleic acid double strand 66 (e.g. vector).

The reference number 64 represents a reaction of the enzymes with the nucleic acid hybrid.

What is claimed is:

1. Method for synthesizing polymers, wherein said method comprises synthesizing a plurality of oligomeric building blocks by parallel synthesis steps, wherein each oligomeric building block is synthesized on a different area of a common support, detaching the plurality of oligomeric building blocks from the support and bringing the oligomeric building blocks into contact with one another to synthesize the polymer, and wherein said different areas of said common support are at least partially in fluid communication during synthesis.

2. Method according to claim 1, wherein double-stranded nucleic acid polymers of at least 300 bp in length are synthesized.

3. A method according to claim 1, wherein the polymers are nucleic acid polymers which are selected from the group consisting of genes or sections thereof, gene clusters or sections thereof, chromosomes or sections thereof, and viral and bacterial genomes or sections thereof.

4. Method according to claim 1, wherein the oligomeric building blocks are from 5 to 150 monomer units in length.

5. Method according to claim 1, wherein partially complimentary oligonucleotide building blocks are detached from the support and are brought into contact with one another or with a polymer intermediate under hybridization conditions in successive steps.

6. Method according to claim 1 for producing synthetic nucleic acid double strands, wherein said method comprises the steps:

(a) providing a support having a surface area which contains a plurality of individual reaction areas,

(b) synthesizing nucleic acid fragments in a location-resolved manner, wherein said nucleic acid fragments comprise different base sequences, as compared to other nucleic acid fragments, in several of the individual reaction areas, and

(c) detaching the nucleic acid fragments from the individual reaction areas.

7. Method according to claim 6, wherein the base sequences of the nucleic acid fragments synthesized in individual reaction areas are chosen such that they can assemble to form a nucleic acid double strand hybrid.

8. Method according to claim 6 wherein the nucleic acid fragments according to step (c) are detached in one or more steps under conditions such that a plurality of the detached nucleic acid fragments assemble to form a nucleic acid double strand hybrid.

9. Method according to claim 8, wherein several nucleic acid fragments which form one strand of the nucleic acid double strand hybrid are linked covalently to one another.

10. Method according to claim 9, wherein the covalent linking includes treatment with ligase or/and filling in gaps in the strands using DNA polymerase.

11. Method according to claim 6, wherein the sequence comprises at one or more position recognition sequences for specific interaction with other molecules.

12. Method according to claim 6, wherein the sequence of the nucleic acid double strands is a naturally occurring sequence, a not naturally occurring sequence or a combination of these two.

US 6,586,211 B1

13

13. Method according to claim 6, wherein the sequence is taken from a database, a sequencing experiment or a device for the integrated synthesis and analysis of polymers.

14. Method according to claim 1, wherein the oligomeric building blocks are synthesized by location- or/and time-resolved illumination by means of a programmable light source matrix.

15. Method according to claim 1, wherein the synthesizing step is a location- or/and time-resolved synthesis of the oligomeric building blocks in a microfluidic reaction support having one or more fluidic reaction compartments and one or more reaction areas within a fluidic reaction compartment.

16. Method according to claim 1, wherein the oligomeric building blocks contain nucleotides occurring in nature, modified nucleotides or mixtures thereof.

17. Method according to claim 1, wherein said oligomeric building blocks contain synthesis building blocks carrying labeling groups for subsequent detection of the polymer.

18. Method according to claim 17, wherein the labeling groups are detectable in a light-dependent manner.

19. The method of claim 1, wherein said method further comprises stabilizing, condensing and/or topologically manipulating a nucleic acid double strand or nucleic acid double strand precursor during or following the assembly of the nucleic acid double strand.

20. A method according to claim 19, where the stabilization, condensation or/and topological manipulation is carried out by functional molecules selected from the group consisting of histones, topoisomerases, DNA-binding agents, DNA-binding proteins, DNA-stabilizing agents, DNA-stabilizing proteins, DNA-condensing agents and DNA-condensing proteins.

21. Method according to claim 1, wherein double-stranded nucleic acid polymers of at least 1000 bp in length are synthesized.

14

22. Method according to claim 1, wherein partially complimentary oligonucleotide building blocks are detached from the support and are brought into contact with (1) one another or with second partially complimentary oligonucleotide building blocks to form a polymer intermediate or (2) with a polymer intermediate under hybridization conditions, to form an advanced polymer intermediate, and thereafter third partially complimentary oligonucleotide building blocks are detached and brought into contact with (1) fourth partially complimentary oligonucleotide building blocks or with third partially complimentary oligonucleotide building blocks to form a polymer intermediate or (2) with a polymer intermediate under hybridization conditions, to form an advanced polymer intermediate, and these steps are repeated.

23. Method according to claim 11, wherein the other molecules are selected from the group consisting of proteins, nucleic acids, peptides, pharmaceuticals, saccharides, lipids, hormones, and organic compounds.

24. Method according to claim 20, wherein the other functional molecules are selected from the group consisting of histones or topoisomerases.

25. Method for synthesizing polymers that are greater than 10,000 bp in length, wherein said method comprises synthesizing a plurality of oligomeric building blocks by parallel synthesis steps, wherein each oligomeric building block is synthesized on a different area of a common support, detaching the plurality of oligomeric building blocks from the support and bringing the oligomeric building blocks into contact with one another to synthesize the polymer, and wherein said different areas of said common support are at least partially in fluid communication during synthesis.

26. Method according to claim 1, wherein the oligomeric building blocks are from 5 to 30 monomer units in length.

* * * * *

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FEBIT HOLDING GMBH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   C.A. No. 07-385 (GMS) |
| | ) |
| CODON DEVICES, INC., | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT CODON DEVICES, INC.'S**
**MOTION TO DISMISS COMPLAINT OF PLAINTIFF FEBIT BIOTECH GMBH**
**OR, IN THE ALTERNATIVE, FOR A MORE DEFINITE STATEMENT**

**NATURE AND STAGE OF THE PROCEEDINGS**

febit biotech GmbH ("febit biotech") filed this patent infringement lawsuit against

Codon Devices, Inc. ("Codon") on June 15, 2007.  The parties have twice stipulated to extend

Codon's time to file a responsive pleading so febit biotech could collect documentation to

attempt to address outstanding questions concerning the ownership of the patent-in-suit.  The

parties prioritized this issue because such questions must be resolved to establish standing to sue

and subject matter jurisdiction.

**INTRODUCTION**

febit biotech sued Codon for infringement of United States Patent No. 6,586,211

(the "'211 Patent").  Finst Decl., Exh. 1 [Complaint (D.I. 1) at ¶ 1.[1]  In its Complaint, febit

biotech baldly asserts that it has standing to bring suit because it allegedly "is the owner of the

entire right, title and interest in and to" the '211 Patent.  *Id.* at ¶ 8.  This allegation is inconsistent

with the face of the '211 Patent.  The '211 Patent identifies a third party, FeBit Ferrarius

---

[1]      References to the "Finst Decl." and "Exh." are to the Declaration of Rip Finst and
Exhibits thereto concurrently filed in support of this Motion.

Biotechnology, GmbH (hereafter, "Febit Ferrarius") as the assignee. Exh. A ['211 Patent] to Exh. 1 [Complaint] at 1. This inconsistency calls into question whether febit biotech has standing in this case. With conflicting claims of ownership obvious from the Complaint and the patent appended to it, febit biotech's conclusory assertion of ownership does not meet its statutory obligation to plead sufficient facts to show that it "is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007). If febit biotech cannot in response to this motion allege facts establishing its ownership of the '211 Patent, its complaint should be dismissed for lack of standing. *Ortho Pharm. Corp. v. Genetics Institute, Inc.*, 52 F.3d 1026, 1030 (Fed. Cir. 1995) (affirming district court's dismissal of plaintiff-patent licensee's suit on ground that licensee lacked standing to sue).

Because there is a serious question as to whether the plaintiff has standing to bring this action at all, Codon has diligently sought clarifying documentation establishing that the plaintiff indeed owns the patent-in-suit. As detailed below, as a result of Codon's efforts to investigate this issue, it has received 19 German documents from febit biotech's counsel. These documents, however, do not themselves establish ownership, but instead reflect that as many as seven different entities have now or have had in the past ownership claims to the patent-in-suit. Separately, an eighth entity, febit, GmbH, has also claimed ownership of the '211 Patent. Codon respectfully submits that, before this case proceeds further, it and this Court are entitled to a clear statement in the Complaint of how febit biotech contends it owns the patent and thus has standing to sue. Such a statement will provide the reasonable and legally required allegation of standing for Codon to evaluate and challenge as warranted.

## STATEMENT OF FACTS

In its Complaint, febit biotech's entire proffer in support of standing is a single-sentence: "febit is the owner of the entire right, title and interest in and to" the '211 Patent. *See* Finst Decl., Exh. 1 [Complaint (D.I. 1)] at ¶ 8. That conclusory claim conflicts with the assignee identified on the face of the '211 Patent, Febit Ferrarius. Exh. A ['211 Patent] to Exh. 1 [Complaint] at 1. A report prepared by the Clerk of this Court and filed with the Complaint also lists Febit Ferrarius – not febit biotech – as the "Holder of Patent." See Finst Decl., Exh. 2 [Report On The Filing Or Determination Of An Action Regarding A Patent Or Trademark (D.I. 4)]. The Complaint does not address this glaring inconsistency between febit biotech's claim of ownership and the identification of a different entity as the owner-of-record.

For more than two months, Codon has attempted to resolve informally this standing issue without Court intervention. Counsel for the parties conferred during the week of July 16 and again on July 24 to discuss the ownership conflict and means for resolution. *See* Finst Decl., Exh. 3 [July 24, 2007 email from R. Finst to M. Evens]. febit biotech's counsel agreed to submit by July 27 a letter and materials evidencing a legal transfer of ownership in the '211 Patent to febit biotech. *See id.*; Exh. 4 [July 27, 2007 email from M. Evens to R. Finst]. To allow febit biotech time to prepare its submission, the parties submitted a stipulation extending the deadline for Codon to answer or otherwise respond to the Complaint by 30 days. *See id.*; D.I. 6 (stipulation as-entered July 26, 2007).

On July 31, 2007, febit biotech submitted five documents, including an untranslated German-language document, in an attempt to establish that it is the current owner of the '211 Patent. Finst Decl., Exh. 5 [July 31, 2007 email and letter from M. Evens to E. Reines]. These documents failed to show that febit biotech was the owner of the '211 Patent and, in fact,

suggested that at least four other German entities may have owned part or all of the patent: (1)

febit AG, (2) Christopher Seagon (a German insolvency administrator presiding over distribution

and sale of assets in connection with dissolution of febit AG), (3) Technostart

Beratungsgesellschaft fur Beteiligungsfonds mbH, and (4) Neckarburg 66, VV GmbH.

Accordingly, one day later, Codon notified febit biotech's counsel that the documents do not

resolve the patent ownership issue and instead paint an ambiguous record concerning the past

and current ownership of the '211 patent.  Finst Decl., Exh. 6 [August 1, 2007 letter from R.

Finst to M. Evens] at 1.  Indeed, the only document that expressly references the '211 patent is a

vague, one-page "Annex."  *Id.*

        As a result of the inconclusive July 31 documentation, which raised more patent

ownership questions than it answered, Codon promptly requested additional documentation,

including agreements referenced in the July 31 documents.  *Id.*  For the next seven weeks, Codon

repeatedly renewed its request for curative or clarifying ownership documentation and febit

biotech's counsel agreed to, but was not able to, provide such documents.  *See* Finst Decl., Exhs.

7 [August 8, 2007 letter from R. Finst to M. Evens], 8 [August 8, 2007 email from M. Evens to

R. Finst], 9 [August 15, 2007 letter from R. Finst to M. Evens]; 10 [August 15, 2007 email from

M. Evens to R. Finst]; 11 [August 17, 2007 email from R. Finst to M. Evens]; 12 [August 24,

2007 email from R. Finst to M. Evens]; 13 [August 27, 2007 email from M. Evens to R. Finst];

14 [September 5, 2007 email from M. Evens to E. Reines]; 15 [September 18, 2007 email from

M. Evens to R. Finst].[2]

---

[2]    To provide febit biotech additional time to collect documents concerning transfer of
ownership, the parties stipulated to a second 30-day extension of the deadline for Codon
to respond to the Complaint.  D.I. 9 (stipulation as-entered August 20, 2007).

On September 19 and 28, Codon finally received fourteen additional documents, including redacted and German-language documents and translations, that allegedly support febit biotech's ownership claim. *See* Finst Decl., Exh. 16 [September 19, 2007 email and letter from M. Evens to E. Reines]; Exh. 17 [September 28, 2007 email from M. Evens to E. Reines]. This documentation also included a report prepared by febit biotech's German counsel summarizing numerous purported transfers of ownership of the '211 Patent. *See* Exh. 16 at 1. Like the July 31 documents, these materials do not resolve – and, instead, further cloud – the ownership picture for the patent-in-suit. In addition to febit biotech, Febit Ferrarius and the four German entities identified above, an additional entity, febit holding GmbH, apparently has an interest in the patent. Indeed, on September 28, plaintiff's counsel filed a Notice of Name Change (D.I. 10) suggesting that febit holding GmbH is now the real party in interest.

Separately, Codon filed suit against febit biotech, Febit Ferrarius (the record owner of the '211 Patent) and febit, GmbH (yet another entity proclaiming sole ownership of the '211 Patent) in the United States District Court for the District of Columbia (Case No. 07-01177 RBW; the "D.C. Action").[3] *See* Finst Decl., Exh. 18 [D.D.C. Complaint]. In the D.C. Action, Codon seeks a judicial determination of the true and correct owner of the '211 Patent and a declaratory judgment of non-infringement and patent invalidity and unenforceability. Codon has no issue with litigating all the pending issues before this Court, but selected the D.C. Court for its declaratory judgment action because that is where additional entities claiming ownership of the patent-in-suit were clearly subject to jurisdiction.

---

[3]     The D.C. Action was filed on June 29, 2007, before febit biotech served Codon with its Complaint.

## ARGUMENT

I. **FEBIT BIOTECH HAS NOT SHOWN AN ENTITLEMENT TO RELIEF OR THAT THE COURT HAS SUBJECT MATTER JURISDICTION**

A. **An Inadequately Pled Complaint Should Be Dismissed**

febit biotech's Complaint should be dismissed because febit biotech has failed to plead allegations sufficient to establish standing and, thus, has no claim upon which relief can be granted or over which the Court has subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b). In *UD Tech. Corp. v. Phenomenex, Inc.*, C.A. No. 05-842-GMS, 2007 WL 28295 (D. Del. Jan. 4, 2007) (Finst Decl., Exh. 21), this Court addressed standing defects similar to but less egregious than those at-issue in the Complaint here. Although the complaint in *UD Tech* alleged assignments of patent rights to the plaintiff, the Court concluded that the allegations had not shown that the plaintiff was granted the right to sue for infringement. *Id.* at *4. Here, febit biotech's allegations are even more poorly plead: febit biotech identifies no instrument transferring an ownership right or a right to sue.

Setting forth the framework for evaluating a motion to dismiss, the Court noted that a Rule 12(b)(1) attack on the pleadings may be either facial or factual. *Id.* at *2. When reviewing a Rule 12(b)(1) facial attack, the Court is limited to the pleadings. *Id.* In reviewing a factual attack, the Court weighs evidence outside the pleadings and accords no weight to the plaintiff's allegations. *Id.*

In *UD Tech*, the Court's evaluation was based on the dismissal standard set forth by the Supreme Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). *Id.* Recently, however, the Supreme Court rejected the *Conley* standard and adopted a pleading standard that demands even more from the plaintiff's allegations than this Court required in *UD Tech. See Bell Atl.*

*Corp. v. Twombly*, 127 S. Ct. 1955 (2007).[4]

In *Bell Atlantic*, the Supreme Court emphasized that the complaint must provide "fair notice" of what the claim is and the grounds upon which it rests. *Bell Atl. Corp.*, 127 S. Ct. at 1964; *see* Fed. R. Civ. P. 8(a)(2) (a complaint requires "a short and plain statement of the claim showing that the pleader is entitled to relief"). The alleged facts must "**possess enough heft**" to show that the pleader is entitled to relief. *Id.* at 1966 (emphasis added). Although a complaint "does not need detailed factual allegations," the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964-65 (citations omitted). Thus, a complaint should be dismissed pursuant to Rule 12(b) if it does not allege "enough facts to state a claim to relief that is plausible." *Id.* at 1974.

Of course, the Court need not take each allegation at "face value." *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 263 (3rd Cir. 1998) (rejecting plaintiff's assertion that "the [district] court should have taken the allegations of its complaint at face value"). The Court has "an obligation … to view the complaint as a whole and to base rulings not upon the presence of mere words but, rather, upon the presence of a factual situation which is or is not justiciable." *Id.* Further, the Court need not accept legal conclusions framed as factual allegations. *Bell Atlantic Corp.*, 127 S.Ct. at 1965. Nor must the Court accept bald assertions, unwarranted inferences or strained interpretations of fact offered by the Complaint. *City of Pittsburgh*, 147 F.3d at 263, n. 13; *see* 5 Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 1286 (3d ed. 2004) (Finst Decl., Exh. 19).

---

[4]    In *Bell Atlantic*, the Supreme Court abandoned *Conley*'s previously "accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bell Atl. Corp.*, 127 S. Ct. at 1968-69 (quoting *Conley*, 355 U.S. at 45-46).

**B.**     **febit biotech's Allegations Fall Far Short Of Establishing Standing**

Standing is a threshold issue in every case. *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *City of Pittsburgh*, 147 F.3d at 269.  In a patent infringement action, only the patentee or successors-in-title have a protectable interest in the patent sufficient to confer standing to sue for infringement. *See* 35 U.S.C. § 281 (A "patentee shall have remedy by civil action for infringement of his patent."); 35 U.S.C. § 100(d) (defining "patentee" as the party to whom the patent issued or any successors in title to the patent); *Ortho Pharm. Corp. v. Genetics Institute, Inc.*, 52 F.3d 1026, 1030 (Fed. Cir. 1995) (affirming district court's dismissal on ground that plaintiff-patent licensee lacked standing to sue).  febit biotech has not, however, pled allegations sufficient to establish ownership of the '211 Patent. *See Ortho Pharm. Corp.*, 52 F.3d at 1032-33 (stating that "[t]he burden of demonstrating standing falls to" the party asserting a claim of infringement).

febit biotech's claim of ownership is contradicted by the '211 Patent referenced in and attached to the Complaint.  In that circumstance, the attached exhibit trumps the allegations. *See City of Pittsburgh*, 147 F.3d at 266-67; 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1363 (3d ed. 2004) ("The district court will not accept as true pleading allegations that are contradicted by ... exhibits attached to or incorporated in the pleading.") (Finst Decl., Exh. 20).

Further, ownership of a patent is a matter of law (*Kahn v. General Motors Corp.*, 77 F.3d 457, 459 (Fed. Cir. 1996)), and the Court need not accept febit biotech's legal conclusion that it is the patent owner. *See Bell Atlantic Corp.*, 127 S.Ct. at 1965 (noting that the Court need not accept legal conclusions set forth as factual allegations).

Finally, a written assignment is required for a change of ownership. *See* 35 U.S.C. § 261; *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1250 (Fed. Cir. 2000) (stating that plaintiff "must produce a written instrument documenting the transfer of proprietary rights in the patents" to establish it had standing to sue). febit biotech neither plead or referenced a legal instrument evidencing a transfer of ownership to it from the named assignee, Febit Ferrarius.[5] Consequently, the Court need not accept febit biotech's unsupported claim of being "the owner of the entire right, title and interest" to the '211 Patent. *See City of Pittsburgh*, 147 F.3d at 263, n. 13.

In summary, even reviewing the allegations of the Complaint in the light most favorable to febit biotech, febit biotech has not plead facts sufficient to show standing nor alleged "enough facts to state a claim to relief that is plausible." *See Bell Atl. Corp.*, 127 S. Ct. at 1974. The Complaint should, therefore, be dismissed.

## II.    IN THE ALTERNATIVE, THE COURT SHOULD REQUIRE FEBIT BIOTECH TO PROVIDE A MORE DEFINITE STATEMENT

Codon moves in the alternative for a more definite statement in the Complaint establishing standing. *See* Fed. R. Civ. P. 12(e). For the reasons set forth above, febit biotech's Complaint is "so vague or ambiguous" that Codon cannot reasonably respond. *See id.* A more definite statement of ownership should include sufficiently detailed descriptions of all transfers of ownership of the patent-in-suit and records filed with the Patent Office so that Codon and the Court can "trace the chain of title" of the patent. *See Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1092 (Fed. Cir. 1998) (concluding that plaintiff lacked standing to assert patent infringement claim where no written assignment of patent rights to plaintiff had been made at

---

[5]    Indeed, febit biotech's failure to allege facts establishing standing appears to be more than a simple oversight. As described in the Statement of Facts, a tortured record of transactions involving the '211 Patent suggests that numerous entities apparently have had or currently have an interest in that patent.

time claims were brought); *see Waterman v. Mackenzie*, 138 U.S. 252 (1891) (suit dismissed

because not brought by record owner); *Speedplay, Inc.*, 211 F.3d at 1250.

## CONCLUSION

For the reasons set forth above, Codon's motion to dismiss should be granted and

febit biotech's Complaint dismissed with prejudice.

MORRIS, NICHOLS, ARSHT & TUNNEL LLP

*/s/ Jack B. Blumenfeld*
Jack B. Blumenfeld (#1014)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com

*Attorneys for Defendant,*
*Codon Devices, Inc.*

OF COUNSEL:

Edward R. Reines
Nicholas A. Brown
Rip Finst
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

October 1, 2007
1251200

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FEBIT HOLDING GMBH,                    )
                                       )
                    Plaintiff,         )
                                       )
            v.                         )     C.A. No. 07-385 (GMS)
                                       )
CODON DEVICES, INC.,                   )
                                       )
                    Defendant.         )

**[PROPOSED] ORDER GRANTING DEFENDANT
CODON DEVICES, INC.'S MOTION TO DISMISS COMPLAINT
OF PLAINTIFF FEBIT BIOTECH GMBH**

Having reviewed the papers and arguments of counsel submitted in connection

with Defendant Codon Devices, Inc.'s Motion To Dismiss Complaint of Plaintiff febit biotech

GmbH or, In The Alternative, For A More Definite Statement ("Codon's Motion"), and finding

good cause therefor, IT IS HEREBY ORDERED that:

Codon's Motion is GRANTED; and

The Complaint of febit biotech GmbH (D.I. 1) is DISMISSED WITH

PREJUDICE.


Dated: _____, 2007

                              _____
                              The Honorable Gregory M. Sleet
                              United States District Judge

**CERTIFICATE OF SERVICE**

I, Jack B. Blumenfeld, hereby certify that on October 1, 2007, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

Mary Matterer, Esquire
MORRIS JAMES

I also certify that copies were caused to be served on October 1, 2007 upon the following in the manner indicated:

**BY ELECTRONIC MAIL
and HAND DELIVERY**

Mary Matterer, Esquire
MORRIS JAMES
500 Delaware Avenue
Suite 1500
Wilmington, DE 19801

**BY ELECTRONIC MAIL
and FIRST CLASS MAIL**

Mark Fox Evens, Esquire
Edward J. Kessler, Esquire
W. Blake Coblentz, Esquire
STERNE, KESSLER, GOLDSTEIN & FOX PLLC
1100 New York Avenue, NW
Washington, DC 20005-3934

/s/ Jack B. Blumenfeld

Jack B. Blumenfeld (#1014)

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FEBIT HOLDING GMBH,

                        Plaintiff,

v.                                               Civil Action No.: 07-385 GMS

CODON DEVICES, INC.,                             **PUBLIC VERSION**

                        Defendant.

**FEBIT HOLDING GMBH'S OPPOSITION TO CODON DEVICES, INC.'S MOTION TO
DISMISS, OR IN THE ALTERNATIVE, FOR A MORE DEFINITE STATEMENT**

P. Clarkson Collins, Jr. (#739)
Mary B. Matterer (#2696)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
302.888.6800
mmatterer@morrisjames.com


*Of Counsel*

Mark Fox Evens
Edward J. Kessler
W. Blake Coblentz
STERNE, KESSLER, GOLDSTEIN & FOX PLLC
1100 New York Avenue, NW
Washington, D.C. 20005-3934
(202) 371-2600


*Attorneys for Plaintiff*

Original Dated: October 26, 2007
Public Version: November 9, 2007

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................1

STATEMENT OF FACTS ...........................................................................................3

ARGUMENT .................................................................................................................5

     1.    Febit Has Shown Entitlement To Relief And That The Court
             Has Subject Matter Jurisdiction...........................................................5

        A.  febit's Complaint Satisfied All Pleading Standards.......................5

        A.  febit's Complaint Establishes Standing ........................................8

V.    CONCLUSION....................................................................................................10

## TABLE OF AUTHORITIES

**Cases**

*Bell Atl. Corp. v. Twombly,*
   127 S.Ct. 1955 (2007)................................................................................................ passim

*Conley v. Gibson,*
   355 U.S. 41 S.Ct. 99, 2 L.Ed.2d 80 (1957) ............................................................. 7

*Eckhard U. Alt, M.D. v. Medtronic, Inc.,*
   C.A. 6:06cv67 ............................................................................................................ 8

*UD Tech. Corp. v. Phenomenex, Inc.*
   C.A. 05-842-GMS, 2007 WL 28295 (D. Del. Jan. 4, 2007)............................... passim

**Statutes**

37 C.F.R. § 3.54 ................................................................................................................ 9

**Other Authorities**

5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed.2004).... 10

## *INTRODUCTION*

febit biotech GmbH ("febit biotech") sued Codon Devices, Inc. ("Codon") for infringement of U.S. Patent No. 6,586,211 (the "'211 patent"), properly alleging that febit owned the '211 patent (Complaint, ¶ 8). On August 6, 2007, febit biotech changed its name to febit holding GmbH ("febit"), due to a shareholder's resolution. *See* Exhs. 32, 43; Eisenlohr Decl., ¶ 12. Codon moved to dismiss the Complaint or, in the alternative, for a more definite statement claiming some alleged confusion over the proper ownership of the '211 patent even though there is no legitimate basis for Codon to make such an assertion to this Court.

febit voluntarily provided Codon with documents that demonstrated the transfer of ownership of the '211 patent to febit biotech and ultimately to febit holding GmbH in a now unsuccessful effort to avoid needless attorneys' fees and wasted court time on this issue. Codon asserts that the 19 German documents provided to Codon do not establish ownership, but merely show that a number of entities have owned the '211 patent. Motion to Dismiss at 2. Codon goes on to state that Codon and this Court are entitled to a "clear statement in the Complaint of how febit [holding] contends it owns the patent." *Id.*

The documents provided to Codon show that febit owns the '211 patent. Furthermore, febit provided Codon with a signed statement from febit's German corporate attorney, who reviewed those documents. This statement provides Codon with the "clear statement" it professes it needs, a clear roadmap of the transfer of rights showing that febit holding GmbH currently owns the entire right and interest in the '211 patent. Although the ownership documents and statement provided to Codon by febit on September 19, 2007, and on September 28, 2007, paint a clear picture of the ownership of the '211 patent, Codon proceeded to file the instant Motion to Dismiss.

Sadly, Codon's Motion to Dismiss is strong on inappropriate invective and hyperbolic language, but short on facts.[1]  Codon did not provide this Court with either the ownership documents or the statement from German counsel.  Had it done so, of course, it would have been clear that Codon's Motion to Dismiss has no merit and no point except to waste this Court's time and to generate attorneys' fees.

Codon erroneously asserts that febit's Complaint was inadequately pled, relying on *UD Tech. Corp. v. Phenomenex, Inc.,* C.A. 05-842-GMS, 2007 WL 28295 (D. Del. Jan. 4, 2007) and *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955 (2007).  Both cases are easily distinguishable from the facts in this case, as will be shown in the Argument section below.  Codon received adequate documentation showing that febit owns the '211 patent before Codon filed its instant Motion.  Accordingly, this Motion is both a waste of the Court's time, febit's resources and Codon's resources.  febit asks the Court to deny Codon's Motion to Dismiss.  febit further asks the Court to award febit reasonable attorneys' fees in connection with its defense of this baseless motion.

### STATEMENT OF FACTS

febit filed the above-captioned patent infringement action against Codon on June 15, 2007, and served the Complaint on Codon on July 9, 2007.  According to the Motion to Dismiss, Codon attempted to resolve informally the standing issue without Court intervention.  *See* Motion to Dismiss at 3.  Codon paints a misleading portrait of the interaction between the parties prior to Codon's filing of the instant motion.  Rather than respond to febit's Complaint, Codon chose to file a separate declaratory judgment action against febit and the '211 patent in the United States District Court for the District of Columbia to decide ownership.  *See* Exh. 4.

---

[1] In its Motion to Dismiss, Codon Devices uses such invective and hyperbolic language as "baldly asserts," "further clouds," "conclusory assertion," "glaring inconsistency" and "egregious."  *See* Motion to Dismiss at 1, 2, 3, 5 and 6.

After receiving notice of the declaratory judgment action, febit's counsel talked with Codon's counsel about Codon's later filed action. *See* Evens Decl., ¶ 7. Codon stated a concern about the ownership of the '211 patent. *See* Evens Decl., ¶ 7. While Codon represents to this Court that it "diligently sought clarifying documentation" from febit's counsel as to the ownership of the '211 patent, more accurately, febit's counsel volunteered to provide Codon with the ownership documents showing the transfer of title of the '211 patent to febit to alleviate Codon's alleged concerns over ownership in the '211 patent in a manner that would reduce unnecessary costs for both parties and would not waste the Court's time. *See* Evens Decl., ¶ 7. febit diligently gathered the ownership documents, prepared certified English translations and provided the English translations to Codon's counsel on July 31, 2007. *See* Exhs. 8-19; Evens Decl., ¶ 10-21. Codon responded that it was not satisfied that the documents showed febit's ownership of the '211 patent. *See* Exh. 20; Evens Decl., ¶ 22.

febit disagreed with Codon, believing that the documents clearly showed the chain of title, but decided to try and resolve this issue by providing more documents. febit's German counsel, Verena Eisenlohr, reviewed the documents and provided a signed statement regarding the ownership of the '211 patent. *See* Exh. 32; Eisenlohr Decl., ¶ 1. Verena Eisenlohr is a German corporate attorney who understands the various aspects of German law with respect to a transfer of property, *inter alia*, when a corporation undergoes a name change and contracts for the sale of property. *See* Eisenlohr Decl., ¶ 1. The signed statement of Verena Eisenlohr provides a clear roadmap showing that febit owns the '211 patent. *See* Exh. 32; Eisenlohr Decl., ¶ 2-13. In addition, as stated in Verena Eisenlohr's statement, febit underwent a name change to febit holding GmbH on August 6, 2007, due to a stockholder's resolution. *See* Exh. 32; Eisenlohr Decl., ¶ 12. The name change was executed in the proper manner under German law

3

and was properly recorded in the Commercial Register of the District Court of Mannheim. *See* Exh. 32; Eisenlohr Decl., ¶ 12. febit provided Codon with the Eisenlohr statement explaining the chain of assignments and the additional certified translations on September 19, 2007, and September 28, 2007. *See* Exhs. 30-44, 48-51; Evens Decl., ¶ 33-47, 51-54.

In its Motion to Dismiss, Codon suggests that the delay in providing the translated documents somehow undercuts the merits of febit's ownership. Motion to Dismiss at 4. This position has no merit. First, it takes time, particularly in the summer, to obtain and prepare the signed statement and certified English translations. Second, several severe illnesses in febit counsel's family also delayed the process. Exh. 22; *See* Evens Decl., ¶ 24, 31. Third, the Eisenlohr statement and the documents show that febit owns the '211 patent and that Codon had this information before filing its Motion to Dismiss. Finally, importantly, not once during this time, did Codon express any concern that the documents were not being delivered in a timely fashion, and not once did Codon express concerns of prejudice.

Despite receiving the relevant ownership documents and a signed statement from febit's German corporate attorney, Codon filed this Motion to Dismiss febit's Complaint for lack of standing and inadequate pleading. Codon fails to point to any specific alleged ambiguities in the ownership documents. Instead, in its Motion to Dismiss, Codon continually refers to febit holding GmbH as "febit biotech" although it has been on notice that febit holding GmbH properly changed the caption on September 28, 2007, and provided Codon with the documents showing that febit holding GmbH owns the entire right and interest in the '211 patent. Codon asserts confusion whether febit holding GmbH (which Codon continually identifies as "febit biotech" in its Motion) is the owner of the '211 patent, claiming there is an inconsistency with the face of the '211 patent, which identifies febit ferrarius biotechnology GmbH on the face of

the '211 patent.[2]  Motion to Dismiss at 1-2.  This argument has no merit, and Codon knows it. Codon does not attach either the statement of German counsel or the translated documents to its motion so the Court can see how little merit there is to this Motion.  Codon neither challenges the veracity of the documents nor points to anything in the documents that supports its Motion, its position or its claimed "confusion".  Codon intentionally withheld from the Court the ownership documents febit had given to Codon that clearly belie Codon's position.  By its actions, Codon implicitly admits that the documents and signed Eisenlohr statement provided by febit on September 19, 2007, and September 28, 2007, show that febit owns the entire right and interest in the '211 patent.

## ARGUMENT

### I.    FEBIT HAS SHOWN ENTITLEMENT TO RELIEF AND THAT THE COURT HAS SUBJECT MATTER JURISDICTION

#### A.    *febit's Complaint Satisfied All Pleading Standards*

febit's Complaint sufficiently pleads ownership of the '211 patent and clearly presents a claim upon which relief can be granted and over which this Court has subject matter jurisdiction. Codon erroneously relies on *UD Tech. Corp. v. Phenomenex, Inc.,* C.A. 05-842-GMS, 2007 WL 28295 (D. Del. Jan. 4, 2007) and *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955 (2007) to support its motion.  Those cases are clearly distinguishable from the facts in this case.

In *UD Tech. Corp.,* U.D. Technology Corp. ("UDTC") asserted both a pre- and post-ownership claim of patent infringement against Phenomenex, Inc.  *UD Tech. Corp.,* 2007 WL 28295, at *3.  Phenomenex, Inc. argued that UDTC lacked standing to assert a pre-assignment patent infringement claim because UDTC did not allege that the assignment conferred on UDTC the right to sue for past infringement.  The facts of *UD Tech. Corp.* not only are distinguishable

---

[2] This particular "confusion" is addressed in Argument, Section B at 9-10, *infra.*

from the facts in this case, but are the reverse of what occurred in this case. In *UD Tech. Corp.*, the plaintiff actually needed to establish that it had the right to sue for past infringement given the date of the assignment of the patent rights to UDTC. Without an assignment of past patent rights, the assignor alone had the right to bring the action. The court found that UDTC never, at any stage of the proceedings -- in its complaint, responsive briefs or amended complaint -- made any attempt to provide the court or the defendant, with any exhibits or documents that purportedly conferred on UDTC the rights to sue for past infringement. *UD Tech. Corp.*, 2007 WL 28295, at *5. Accordingly, UDTC's right to sue for pre-ownership infringement was insufficiently pled, *Id.* at *3, and the court found that UDTC could not pursue such a claim for past infringement. *Id.* at *6. However, the court gave UDTC leave to amend to demonstrate that it had the right to pursue post-ownership infringement activities. *Id.* at *6.

In this case, whether the assignments confer a right to sue for past infringement prior to the date of assignment is not an issue because Codon's infringing activities probably do not antedate the patent assignment to febit. Moreover, the concern regarding providing documentation of the assignment is not an issue because febit, unlike the plaintiff in *UD Tech. Corp.*, timely provided to Codon (and now to the Court) the pertinent ownership documents and a statement from an outside German attorney which clearly explains the transfer of ownership rights of the '211 patent to febit biotech and ultimately to febit holding GmbH. febit redacted only financial information and any unrelated asset information from the ownership documents, but nothing regarding the ownership of the '211 patent was redacted. These documents, statement and affidavit demonstrate that febit clearly is the owner of the entire right and interest

of the '211 patent.[3]  Ironically, it is Codon and not febit, that finds itself akin to UDTC because in its Motion to Dismiss, Codon chose not to provide these documents to the Court to resolve any alleged ambiguity.

*Bell Atl. Corp.* is also distinguishable from this case. *Bell Atl. Corp.* was an antitrust case where the Supreme Court held that the complaint was not sufficiently pled. *Bell Atl. Corp.*, 127 S.Ct. at 1973.  The Court noted that "'for most types of cases, the Federal Rules eliminated the cumbersome requirement that a claimant "set out *in detail* the facts upon which he bases his claim,' *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (emphasis added by the Court), Rule 8(a)(2) still requires a "showing," rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp.*, 127 S.Ct. at [FN 3].    Thus, in pleading an antitrust case, a plaintiff must provide the defendant with sufficient allegations and examples so the defendant knows just what it is alleged to have done in violating the law.  Codon's Motion to Dismiss does not contain any statement that Codon does not know what it did substantively;  Codon knows that it is alleged to have infringed the claims of the '211 patent.

However, Codon wants this Court to extend *Bell Atl. Corp.* to require every owner of a patent that wishes to assert its rights in a patent infringement suit to provide the actual assignment contracts at the time of pleading.  Nothing in *Bell Atl. Corp.* suggests such a result, and Codon has not cited any decision that has so extended *Bell Atl. Corp.*  Codon's suggested result is contrary to the regular practice of Codon's own counsel, as exemplified by the example

---

[3] In *UD Tech. Corp.*, the court states that the burden on the plaintiff to prove jurisdiction is relatively light, since "'dismissal for lack of jurisdiction is not appropriate merely because the legal theory alleged is probably false, but only because the right claimed is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as to not involve a federal controversy." *UD Tech. Corp.*, 2007 WL 28295 at *2 (citing *Kulick v. Pocono Downs Racing Ass'n*, 816 F.2d 895, 899 (3d Cir. 1987)(quoting *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 666(1974)). febit easily satisfies this test.

complaint for patent infringement filed by counsel in which their own clients merely allege ownership of the patent without providing more information.[4] This example complaint provides the same evidence of ownership that febit provided with its complaint in this case. febit easily met the pleading standards set by the Federal Rules and is consistent with a proper reading of *Bell Atl. Corp.* and Codon's counsel's own pleading practice.

### B.    *febit's Complaint Establishes Standing*

According to Codon, febit's claim of ownership is contradicted by the '211 patent referenced in and attached to the Complaint and that the attached patent trumps the allegation in the Complaint.[5] *See* Motion to Dismiss. Nothing could be further from the truth, and Codon's counsel, as experienced trial lawyers in patent cases, know it.

The assignee identified on the face of a patent is the assignee *at the time of issue.* *See* Exh. 59, MPEP § 307, Evens Decl., ¶ 62. It is not uncommon for the assignee listed on the face of the patent to transfer its rights to a different assignee after the patent has been issued. In that situation, the new owner, if it chooses, can record the assignment with the United States Patent

---

[4] In a complaint filed by Codon's counsel Weil, Gotshal & Manges LLC ("Weil Gotshal") on behalf of the plaintiff in *Eckhard U. Alt, M.D. v. Medtronic, Inc.*, C.A. 6:06cv67, filed in the U.S. District Court for the Eastern District of Texas, Weil Gotshal alleged that Dr. Alt is the assignee of the '355 patent. Weil Gotshall neither cited nor provided any documentation to support this statement. *See* Exhibits 54-56. According to the assignment database on the USPTO website, several assignments demonstrating several changes in ownership took place before the complaint was filed. *See* Exhibit 57. Because of the assignments, the same "discrepancy" appears in Weil Gotshal's Texas case as appears in this case - the party bringing the infringement action and claiming ownership is different than the assignee on the face of the published patent. This fact is normal and raises no red flags. Yet, under its proposed rules of pleading as outlined in the instant case, Weil Gotshal should have amended its Texas complaint to include the entire ownership chain in its complaint and should have provided the supporting ownership documents. This example complaint demonstrates that Weil Gotshal knows full well that there is no pleading rule requiring such an action and is further evidence that Codon's Motion to Dismiss is a pure waste of judicial time.

[5] Codon also argues that a report filed by the Clerk of the Court listing "Febit Ferrarius - not febit biotech - as the 'Holder of Patent,'" somehow contributes to the "glaring inconsistency." Motion to Dismiss at 3. As shown herein, there is no merit to this argument.

and Trademark Office ("USPTO"), but the patent will not be re-published with the new assignee on the face of the patent. *See* Exh. 59, MPEP § 307; Evens Decl., ¶ 62. Whether or not the assignment is recorded at the USPTO has no bearing on the validity of the assignment nor the effect of the assignment on the ownership of the patent property. *See* Exh. 58, 37 C.F.R. § 3.54; Evens Decl., ¶ 61.

febit stated as a factual allegation in its Complaint that it is the owner of the '211 patent. That allegation must be taken as true for initial pleading purposes absent clear evidence to the contrary. Codon has presented no such evidence with its Motion to Dismiss other than the '211 patent and the Clerk's Notice, and that demonstrates nothing of consequence, as demonstrated above.

Codon well knows (as evidenced by the example Texas complaint filed by its own counsel where there also is a difference between the plaintiff represented by Weil Gotshal and the owner listed on the face of the patent) that notice pleading is entirely proper and appropriate under the Federal Rules. Factual allegations must be enough to raise a right to relief above the speculative level, *see* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed.2004).

Further, while it is not necessary at this stage of the litigation to go further, febit voluntarily provided Codon with sufficient evidence to show the continuous chain of title from the named inventors through and including the present ownership in febit holding GmbH, the plaintiff in this matter. Moreover, while Codon deliberately chose not to submit these documents with its Motion, febit has submitted the ownership documents to this Court along with the statement of Verena Eisenlohr, a German attorney. Thus, febit easily satisfies any reasonable test establishing ownership as a matter of pleading.

### CONCLUSION

For the foregoing reasons, febit's Complaint has been properly pled; febit has standing before this Court. Further, the ownership of the '211 patent was adequately resolved before Codon filed its Motion to Dismiss and it is both a waste of the Court's time and febit's resources to address this motion. Thus, febit ask the Court to award febit its reasonable attorneys' fees. In the alternative, febit reserves the right to amend its Complaint in the unlikely event that the Court deems such action to be necessary.

FEBIT BIOTECH GMBH

Date:  October 26, 2007                    By:

P. Clarkson Collins, Jr. (#739)
Mary B. Matterer (#2696)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801
(302) 888-6800
mmatterer@morrisjames.com

Mark Fox Evens
Edward J. Kessler
W. Blake Coblentz
STERNE, KESSLER, GOLDSTEIN & FOX PLLC
1100 New York Avenue, NW
Washington, D.C.  20005-3934
(202) 371-2600

*Attorneys for Plaintiff*

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FEBIT BIOTECH GMBH,

              Plaintiff,

        v.

CODON DEVICES, INC.,

              Defendant.

Civil Action No. 07-385 GMS

**CODON DEVICES, INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO
DISMISS COMPLAINT OR, IN THE ALTERNATIVE,
<u>FOR A MORE DEFINITE STATEMENT</u>**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
1201 North Market Street
P.O. Box 1347
Wilmington, DE   19899
(302) 658-9200
jblumenfeld@mnat.com
*Attorneys for Defendant*
    *Codon Devices, Inc.*

*Of Counsel*:

Edward R. Reines
Nicholas A. Brown
Rip J. Finst
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA   94065
(650) 802-3000

November 5, 2007

.

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 2

I.    FEBIT BIOTECH'S COMPLAINT SHOULD BE DISMISSED AND RE-PLED
      WITH ACTUAL FACTS ................................................................................ 2

      A.    Under *Bell Atlantic*, febit biotech's Claim Fails Because It Does Not
            Allege Facts Supporting Its Claim To Standing .................................... 2

      B.    febit biotech's Tender of Documents and a Legal Opinion From Its
            German Counsel Does Not Cure Its Failure To Plead Facts ................. 4

      C.    The Court Should Not Convert Codon's Facial Attack On The Complaint
            Into A Factual Determination Of febit biotech's Ownership Claim ...... 7

II.   FEBIT BIOTECH DOES NOT DISPUTE THAT A MORE DEFINITE
      STATEMENT IS APPROPRIATE ................................................................. 8

CONCLUSION .................................................................................................... 9

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Arachnid, Inc. v. Merit Industrial, Inc.*,
    939 F.2d 1574 (Fed. Cir. 1991)................................................................4, 5

*Argos v. Orthotec LLC*,
    304 F. Supp. 2d 591 (D. Del. 2004).........................................................2, 7

*Bell Atlantic Corp. v. Twombly*,
    127 S. Ct. 1955 (2007).............................................................................passim

*Gould Electrics Inc. v. United States*,
    220 F.3d 169 (3rd Cir. 2000)...................................................................7, 8

*In re Intel Corp. Microprocessor Antitrust Litigation*,
    496 F. Supp. 2d 404 (D. Del. 2007).........................................................3

*In re Intel Microprocessor Antitrust Litigation*,
    452 F. Supp. 2d 555 (D. Del. 2006).........................................................passim

*Iqbal v. Hasty*,
    490 F.3d 143 (2nd Cir. 2007)...................................................................3

*Kahn v. General Motors Corp.*,
    77 F.3d 457 (Fed. Cir. 1996)....................................................................2, 3

*Mortensen v. First Fed. Sav. and Loan Ass'n, Mortensen*,
    549 F.2d 884 (3rd Cir. 1977)....................................................................7, 8

*Pittsburgh v. West Penn Power Co.*,
    147 F.3d 256 (3rd Cir. 1998)....................................................................5

*Speedplay, Inc. v. Bebop, Inc.*,
    211 F.3d 1245 (Fed. Cir. 2000).................................................................6

*UD Technology Corp. v. Phenomenex, Inc.*,
    C.A. No. 05-842-GMS, 2007 WL 28295 (D. Del. 2007)..........................4, 7

## INTRODUCTION

In this patent infringement action, plaintiff febit biotech GmbH ("febit biotech") [1] has to establish standing to sue defendant Codon Devices, Inc. ("Codon") for infringement of the asserted '211 patent.    All febit biotech alleged in its complaint was a bare legal conclusion: that it is "the owner of the entire right, title and interest in and to" the '211 Patent.    Finst Decl., Exh. 1 [Complaint (D.I. 1)] at ¶ 8.[2]    But the '211 patent lists a different entity, Febit Ferrarius Biotechnology, GmbH ("Febit Ferrarius"), as the assignee of the patent.    Plaintiff's conclusory legal allegation that it owns the '211 patent is not enough to satisfy Rule 8, particularly when that allegation is contradicted by the only pertinent fact contained in the pleadings – the '211 patent's statement that its assignee is a different entity.

Codon is a small company with a strong interest in achieving the most efficient possible resolution to this lawsuit.    The Federal Rules of Civil Procedure entitle it to a clear statement of the basis for febit biotech's claims against it.    Here, where the entity alleging it has the right to sue on the '211 patent purports to have obtained that right through a complex chain of transactions occurring in Germany, a "short and plain statement" showing that "the pleader is entitled to relief" includes more than just a bare legal conclusion of ownership.    Codon is not asking the Court to resolve the question of standing now.    Codon is simply asking for what it believes it is entitled to: a short and plain statement of the facts that febit biotech alleges establish its ownership of the '211 patent so that Codon can evaluate them in litigation without wasting its limited resources pursuing unnecessary and costly discovery.

With its opposition, febit biotech has submitted more than thirty "pertinent ownership documents," many of which were translated from German, in an attempt to convert

---

[1]  Although febit biotech has purportedly changed its name to "febit holding GmbH," Codon will refer to the plaintiff named in the complaint throughout this brief.

[2]  References to the "Finst Decl." are to the Declaration of Rip Finst filed in support of Codon's opening brief [Docket No. 12].    References to the "Evens Decl." and the "Eisenlohr Decl." are to the Declaration of Mark Fox Evens and the Declaration of Verena Eisenlohr, respectively, filed in support of febit holding GmbH's opposition brief ("Opp.").

Codon's request into a determination of the merits of its ownership claim.    This is wholly unfair.

Codon has had no chance to test any of the complex factual and legal assertions febit biotech has

made about the multiple transactions that purportedly leave it as the sole owner of the '211

patent.    The whole point of Codon's motion, which was a simple, facial attack on the pleading

under Rule 12(b)(1), was to allow it to most efficiently test those assertions by obtaining a "short

and plain statement" of the purportedly relevant facts.    febit biotech should be ordered to

properly plead its ownership allegation under the Federal Rules so that the parties can determine

what facts are in dispute and then litigate them, if appropriate.

## ARGUMENT

I.    **FEBIT BIOTECH'S COMPLAINT SHOULD BE DISMISSED AND RE-PLED
WITH ACTUAL FACTS**

    A.    **Under *Bell Atlantic*, febit biotech's Claim Fails Because It Does Not Allege
Facts Supporting Its Claim To Standing**

        Rule 8(a)(2) requires febit biotech to provide "a short and plain statement of the

claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of

what the ... claim is and the grounds upon which it rests" so that Codon may properly respond to

and/or defend the claim.    This rule facilitates a speedy and cost-effective determination of

litigation by identifying facts and issues in dispute.    *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955,

1965-66 (2007).

        By failing to state *any* facts supporting its claim to own the patent it seeks to

enforce, febit biotech has failed to meet its Rule 8 obligation of "clearly alleging facts

demonstrating that it is a proper party to invoke judicial resolution of the dispute."    *Argos v.*

*Orthotec LLC*, 304 F.Supp.2d 591, 593 (D. Del. 2004).    The Supreme Court has made clear that

courts need not accept legal conclusions set forth as factual allegations.    *See Bell Atl. Corp.*, 127

S.Ct. at 1965.    Ownership of a patent is a legal conclusion, not a fact.    *Kahn v. General Motors*

*Corp.*, 77 F.3d 457, 459 (Fed. Cir. 1996) (ownership of a patent is a matter of law).    Yet all

febit biotech has alleged is the bare legal conclusion that "febit [biotech] is the owner of the

entire right, title and interest in and to" the '211 Patent.    *See* Opp. at 9; Finst Decl., Exh. 1
[Complaint (D.I. 1)] at ¶ 8.

As febit biotech concedes, its ownership allegation is inconsistent with the face of
the asserted patent attached to its complaint, which identifies a third party, FeBit Ferrarius, as the
assignee.    *See* Opp. at 8-9.    This makes the bare legal conclusion that febit biotech is the
owner of the '211 patent inconsistent with the only fact in the pleading about ownership – the
fact that the '211 patent is listed as being owned by Febit Ferrarius.    As a result, febit biotech's
pleading is plainly insufficient to meet its obligation to allege facts with "enough heft" to show
that its claim for relief is "plausible."    *Bell Atl. Corp.*, 127 S. Ct. at 1966.    The "plausibility
standard" of *Bell Atlantic* "obliges a pleader to amplify a claim with some factual allegations in
those contexts where such amplification is needed to render the claim plausible."    *Iqbal v.
Hasty*, 490 F.3d 143, 157-158 (2nd Cir. 2007), followed in *In re Intel Corp. Microprocessor
Antitrust Litigation*, 496 F.Supp.2d 404, 408 (D. Del. 2007).    febit biotech's ownership claim is
exactly the type of allegation where "amplification" is needed.[3]    Thus, the Court should force
febit biotech to properly plead facts showing its standing to bring this suit.    *In re Intel
Microprocessor Antitrust Litigation*, 452 F.Supp.2d 555, 557 (D. Del. 2006).

Contrary to febit biotech's contention, Codon does not read *Bell Atlantic* to
require a plaintiff to "provide the actual assignment contracts at the time of pleading."    *See* Opp.
at 7.    Indeed, a *Bell Atlantic*-compliant pleading need not even set forth "detailed factual
allegations."    *Bell Atl. Corp.*, 127 S. Ct. at 1964.    However, the complaint must contain a short
and plain statement of facts sufficient "enough to raise a right to relief above the speculative
level."    *Id.* at 1965; *see* Rule 8(a)(2).

---

[3]  febit biotech's argument that its complaint is sufficiently plead when measured against a
complaint Codon's counsel, Weil Gotshal & Manges, filed in an unrelated Texas action (*see* Opp.
at 8) is meritless.    The Texas complaint was dismissed (and filed) last year, before the *Bell
Atlantic* decision that now governs the pleading standard set forth in the Federal Rules.    *See*
Evens Decl., Exhs. 54 [docket in Texas action], 55 [complaint, filed February 15, 2006].    *Bell
Atlantic* governs the instant action, but did not exist as of the time of the Texas action.

Here, that means that febit biotech should plead facts showing that it does in fact own the '211 patent despite the fact that the face of the '211 patent suggests otherwise. Without some factual allegation in the complaint, febit biotech has not provided "fair notice" to Codon of the nature of its claim or the "grounds" upon which it rests. *See Bell Atl. Corp.*, 127 S. Ct. at 1965, fn.3. Indeed, when allegations do "not raise a claim of entitlement to relief, this basic deficiency should be exposed" as early as possible to avoid "expenditure of time and money by the parties and the court." *Id.* (citations omitted). Asking for "plausible grounds" at the pleading stage "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence." *Id.* Otherwise the litigation would needlessly "take up the time" of the Court and Codon. *See id.* at 1966 (citations omitted).

Not only is proper pleading of standing important to frame the issue of subject matter jurisdiction, it may affect other issues in the case. For example, even if febit biotech is the owner by assignment of the '211 patent, it may not have standing to sue for damages from the time prior to when it became the owner. *See UD Tech. Corp. v. Phenomenex, Inc.*, C.A. No. 05-842-GMS, 2007 WL 28295, *4 (D. Del. 2007) ("[I]f ownership of the patent is transferred, the transferor retains the right to sue for pre-transfer infringements unless that right is expressly relinquished in the transfer"); *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1579 (Fed.Cir. 1991). Unless febit biotech's complaint clearly spells out when it alleges to have obtained ownership of the '211 patent, the parties may waste time and resources litigating a damages claim that is not at issue.

### B.    febit biotech's Tender of Documents and a Legal Opinion From Its German Counsel Does Not Cure Its Failure To Plead Facts

febit biotech argues that it has "clearly explain[ed] the transfer of ownership rights of the '211 patent to febit biotech" by providing "the pertinent ownership documents and a statement from an outside German attorney." Opp. at 6. However, these "pertinent ownership documents" are not a simple assignment or set of assignments, but a collection of more than thirty documents, many of which are translated from German, and some of which are incomplete.

4

Indeed, it appears that none of these documents is an actual assignment, and some of the contracts are, at best, agreements to assign that do not themselves effect an actual transfer of title. *See Arachnid, Inc.*, 939 F.2d at 1581.    Without the identification of an instrument to support its ownership claim, the Court need not accept febit biotech's unsupported legal claim to be "the owner of" the '211 Patent.    *See Bell Atl. Corp.*, 127 S. Ct. at 1965; *Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 263, n. 13 (3rd Cir. 1998).

      The complexity of febit biotech's "pertinent ownership documents" is demonstrated by the 9-page declaration from a German attorney that purports to explain the complex series of transactions that allegedly gives febit biotech standing.    *See* Eisenlohr Decl.; *see also* Evens Decl., Exh. 32 [counsel's opinion of ownership].    Even the German attorney submitting the declaration concedes that her opinions are based on a number of unsupported assumptions:

> 13. This statement is based on the assumption that FeBit Ferrarius Biotechnology GmbH was originally the owner of the '211 patent, that the title of the '211 patent was only transferred by the purchase agreements mentioned above and that the respective sellers had not transferred the '211 patent to a third party prior to the aforementioned purchase agreements.

Worse, the declaration further alleges facts inconsistent with these assumptions, stating at one point that when the patent issued, the patent's owner was actually "febit AG," not FeBit Ferrarius.    Eisenlohr Decl. at ¶ 6.

      Moreover, the documents febit biotech identifies themselves reveal a number of gaps and problems in the alleged series of German legal transactions that purportedly give febit biotech rights.    According to febit biotech, the named assignee of the patent (Febit Ferrarius) changed its name and then went bankrupt.    An option to purchase the '211 patent was allegedly sold out of bankruptcy to a company that then allegedly exercised the option and then sold its rights, which eventually reached febit biotech.    Yet the documents reveal a number of problems with this story.

For example, febit AG was not the result of a mere name change.    Febit Ferrarius, a limited liability corporation, was apparently terminated, and febit AG, a stock corporation, was formed as an independent corporate entity.    *See* Evens Decl., Exhs. 34, 35; Eisenlohr Decl. at ¶ 5 (citing Evens Decl., Exhs. 34, 61)).    febit biotech offers no evidence of an assignment of the patent from Febit Ferrarius to febit AG.    *See Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1250 (Fed. Cir. 2000) (stating that party claiming transfer of all substantial rights in the patent-in-suit "must produce a written instrument documenting the transfer of proprietary rights in the patents").

Further, during dissolution of febit AG, TechnoStart Beratungsgesellschaft für Beteiligungsfond mbH ("TechnoStart") allegedly acquired from the insolvency administrator an option to purchase the '211 Patent by December 12, 2004.    Eisenlohr Decl., ¶ 8; Evens Decl., Exh. 32.    TechnoStart did not exercise its option until 5 days after the deadline to do so.    *See id.*; Evens Decl., Exhs. 39, 63.    febit biotech does not explain, even in the declaration from its German attorney, how this exercise after the expiration of the option could possibly have had legal effect under German law.

The identity of the patents transferred from TechnoStart to Neckarburg (which purportedly included the '211 patent) is similarly unknown because the "Annex," captioned "IP Portfolio," that supposedly lists the subject patents is entirely redacted.    Evens Decl., Exh. 10/11 at 2 (§1(2)); Evens Decl., Exh. 41 at 2 (§1(2)), 49.    A subsequent letter from TechnoStart to febit biotech does not identify which patents were acquired by Neckarburg either. Evens Decl., Exh. 16 and 17.    Further, according to the TechnoStart-Neckarburg contract, the assets sold "do not pass to the purchaser until the purchase price has been paid in full." *Id.* at 3 (§3, §4(1)).    febit biotech offers no evidence that money, in fact, changed hands.

In short, the ownership trail here is complex and bizarre, and mostly the result of German transactions.    The Court should direct febit biotech to clearly set forth the facts that it alleges establish its ownership.

C.    **The Court Should Not Convert Codon's Facial Attack On The Complaint Into A Factual Determination Of febit biotech's Ownership Claim**

While febit biotech asks the Court to resolve the question of subject matter jurisdiction on the merits now, doing so would be fundamentally unfair. febit's biotech's argument misapprehends "a crucial distinction" between a 12(b)(1) motion that challenges the complaint on its face and a 12(b)(1) motion that "attack[s] the existence of subject matter jurisdiction in fact, quite apart from any pleadings." *Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3rd Cir. 1977). Because Codon has not filed an answer to the complaint,[4] its attack on jurisdiction under Rule 12(b)(1) "is necessarily considered a facial attack." *Argos*, 304 F.Supp.2d at 593; *Mortensen*, 549 F.2d at 891-92, n.17. A facial challenge "is limited to the allegations in the complaint, the documents referenced in or attached to the complaint, and matters in the public record." *In re Intel Microprocessor Antitrust Litigation*, 452 F.Supp.2d at 557; *see Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3rd Cir. 2000); *UD Tech. Corp.*, 2007 WL 28295, at *2.[5] In a facial challenge, the Court should not consider extrinsic evidence, despite febit biotech's invitation to do so. *See id.*

But even if Codon's motion were construed as a 12(b)(1) factual attack, it is premature and impractical to adjudicate jurisdiction now. Discovery has not started, let alone reached a point where it would make sense for the Court to consider and weigh evidence to

---

[4] febit biotech's contention that "Codon chose to file a separate declaratory judgment action against febit" rather "than respond to febit's complaint" is misleading. febit biotech filed its complaint on June 15, 2007 but did not immediately serve Codon. Two weeks later, on June 29, Codon filed its complaint in the District of Columbia because it was unclear when – or even if – febit biotech was ever going to serve Codon. febit biotech had reasonable time to serve Codon before Codon filed its complaint, and, of course, Codon could not have responded to febit biotech's complaint until it was served. febit biotech finally served Codon on July 9, 2007.

[5] Consequently, Codon properly limited its challenge to the pleadings and submitted no extrinsic evidence. febit biotech's repeated assertions that Codon should have submitted with its opening brief the ownership documents or the legal opinion of its German counsel (*see* Opp. at 2, 7, 9) are controverted by the law – and febit biotech cites no authority that would permit Codon (or even febit biotech) to proffer extrinsic evidence in a facial attack. Likewise, because the focus is on the sufficiency of the pleadings standing alone, Codon did not have to, as febit biotech alleges, "point to any specific alleged ambiguities in the ownership documents." *See* Opp. at 4.

"satisfy itself as to the existence of the power to hear the case."    *Mortensen*, 549 F.2d at 892; *In re Intel Antitrust Litigation*, 452 F.Supp.2d at 557.    Thus, courts generally refuse to decide factual attacks when, as here, there is an incomplete evidentiary record.    *See Gould Elecs. Inc.*, 220 F.3d at 177.    And even where the record is complete, "the court must conduct a plenary trial on the contested facts prior to making a jurisdictional determination."    *Id.*

Codon should not bear the hardship and expense of conducting early and expedited foreign discovery, as well as developing expert testimony.    As a start-up company with ~70 employees and limited financial resources, discovery (in Germany where febit biotech is headquartered and most or all of the relevant documents and persons with knowledge appear to be located) for the limited purpose of collecting evidence about patent ownership would be unduly expensive and burdensome.    If the complaint is not dismissed, febit biotech should amend its complaint to include facts underlying its ownership claim so that Codon's discovery can be more focused and, thus, less costly for both parties.    To that end, Codon seeks a pleading that frames the issues about the alleged chain of title supporting febit biotech's claim of ownership.

## II.    FEBIT BIOTECH DOES NOT DISPUTE THAT A MORE DEFINITE STATEMENT IS APPROPRIATE

febit biotech does not provide any argument in response to Codon's request, in the alternative, for a more definite statement.    Thus, the Court should, at a minimum, order febit biotech to amend its complaint.

## **CONCLUSION**

For the reasons set forth in Codon's opening brief and herein, Codon's motion to dismiss should be granted and febit biotech's Complaint dismissed with prejudice.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld (#1014)*
Jack B. Blumenfeld (#1014)
1201 North Market Street
P.O. Box 1347
Wilmington, DE   19899
(302) 658-9200
jblumenfeld@mnat.com
*Attorneys for Defendant*
*Codon Devices, Inc.*

*Of Counsel*:

Edward R. Reines
Nicholas A. Brown
Rip J. Finst
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA   94065
(650) 802-3000

November 5, 2007

1306610

9

## CERTIFICATE OF SERVICE

I, Jack B. Blumenfeld, hereby certify that on November 5, 2007, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

Mary Matterer, Esquire
MORRIS JAMES

I also certify that copies were caused to be served on November 5, 2007 upon the following in the manner indicated:

**BY ELECTRONIC MAIL
and HAND DELIVERY**

Mary Matterer, Esquire
MORRIS JAMES
500 Delaware Avenue
Suite 1500
Wilmington, DE    19801

**BY ELECTRONIC MAIL
and FIRST CLASS MAIL**

Mark Fox Evens, Esquire
Edward J. Kessler, Esquire
W. Blake Coblentz, Esquire
STERNE, KESSLER, GOLDSTEIN & FOX PLLC
1100 New York Avenue, NW
Washington, DC    20005-3934

*/s/ Jack B. Blumenfeld (#1014)*
Jack B. Blumenfeld (#1014)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CODON DEVICES, INC.<br><br>                    Plaintiff,<br><br>v.<br><br>FEBIT BIOTECH GMBH, FEBIT<br>FERRARIUS BIOTECHNOLOGY AND<br>FEBIT, GMBH<br><br>                    Defendants. | Civil Action No.: 07-CV-1177-RBW |

**[PROPOSED] ORDER TO GRANT DEFENDANT'S
MOTION TO DISMISS OR, ALTERNATIVELY,
TO TRANSFER VENUE OR, ALTERNATIVELY, TO STAY**

Before the Court is Defendant febit biotech GmbH, febit ferrarius biotechnology and febit, GmbH Motion to Dismiss all counts of Plaintiff Codon Devices, Inc.'s ("Codon") Complaint. After careful consideration of the Motion, Plaintiff Codon's response and this Court having fully considered the premises, it is hereby

ORDERED that Defendant febit's Motion is GRANTED; and

ORDERED that the Complaint of Plaintiff Codon is DISMISSED WITH PREJUDICE.

Signed this _____ day of _____ 2007.

/s/_____

REGGIE B. WALTON
UNITED STATES DISTRICT JUDGE
DISTRICT OF COLUMBIA

1

## CERTIFICATE OF SERVICE

I, Mark Fox Evens, hereby certify that on December 10, 2007, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

Adam P. Strochak
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street, NW, Suite 900
Washington, DC  20005

I also certify that copies were caused to be served on December 10, 2007 upon the following in the manner indicated:

### BY ELECTRONIC MAIL

Adam P. Strochak
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street, NW, Suite 900
Washington, DC  20005

### BY ELECTRONIC MAIL
### And FIRST CLASS MAIL

Edward R. Reines
Nicholas A. Brown
Rip Finst
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065


_____/s/_____
Mark Fox Evens